(No. 58789.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. CHARLES HATTERY, Appellant.

*Opinion filed November 21, 1985.—Rehearing denied February 4, 1986.*

450

452

MILLER, J., dissenting.

James B. Haddad, of Chicago (Alan M. Freedman and Bruce H. Bornstein, of Freedman & Bornstein, of counsel), for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (Joan S. Cherry, Kevin Sweeney and Karyn Stratton, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MORAN delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, defendant, Charles Hattery, was convicted of the murders of Trenette Anderson and her two children, Reshonda and Albert, Jr. (A codefendant, Rufus Mister, was found not guilty in a bench trial conducted simultaneously with defendant's jury trial.) Pursuant to section 9—1(d) of the Criminal Code of 1961 (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(d)), the State requested a death penalty hearing, which was heard by the same jury. The jury found that the necessary aggravating factors existed, and that there were no mitigating circumstances sufficient to preclude imposition of the death penalty. The court thereupon sentenced defendant to death on the murder convictions. Defendant brings a direct appeal to this court (Ill. Const. 1970, art. VI, sec. 4(b); 87 Ill. 2d R. 603), alleging numerous errors in all stages of the proceedings.

The record discloses that on December 4, 1982, at about 1 a.m., Albert Anderson left his Chicago apartment and walked to a nearby store to purchase a pack of cigarettes. The store was closed. While walking home, he met the defendant, and "Smooth," whom Anderson identified as Rufus Mister. Mister immediately began arguing with Anderson about drugs. Mister claimed that he had supplied Anderson with drugs before, and wanted him to reciprocate. Anderson, in an effort to calm Mister, said he was willing to discuss the matter and invited the men to his apartment.

Upon arriving at the apartment, they were met by Anderson's wife, Trenette. The couple's two children,

Reshonda, age 7 months, and Albert, Jr., who was 22 months old, were asleep in the bedroom. Anderson testified that Mister again started "hollering about drugs." Anderson offered to give him money, but Mister insisted that Anderson help him find drugs. He agreed to accompany Mister to the home of "Fluky," a local drug supplier. Mister told defendant to stay in the apartment with Trenette and the two children. Anderson also overheard Mister tell defendant that if he did not return in five minutes, defendant "knows what to do." Anderson and Mister then left the apartment.

The men's initial effort to obtain drugs was unsuccessful, and Mister insisted that they continue to search for drugs. Anderson testified that they arrived back at his apartment at about 6 a.m. They were accompanied by Mister's girlfriend, Kathy Robinson, and two other women, whom Anderson identified only as Penny and Pearl. Anderson knocked at the back door several times. When no one answered, Mister kicked the door down. They walked through the kitchen into the living room. Anderson noticed that there was blood on the living room floor. They then walked into the bedroom, where they found Trenette's body on the bed. Anderson observed that her night gown was pulled up over her breasts and that her wrist had been cut. The body of his son, Albert, Jr., also was on the bed. Pearl walked over to the crib and picked up Reshonda. As she did so, the baby's head fell backwards. Anderson stated, "[O]h, my God, no, not my kids too." He then placed Reshonda's dead body on the bed next to the body of her mother.

In a statement taken by an assistant State's Attorney and transcribed by a court reporter, defendant, age 22, said that Mister ordered him to stay behind in the apartment while Mister and Anderson searched for drugs. Mister told him that if he did not return in five minutes, defendant was to kill Anderson's wife and two children.

Mister threatened to harm defendant and his family if defendant did not comply with Mister's orders. After they left, defendant set his digital watch and proceeded to keep track of the time. When five minutes passed, he told Trenette that he planned to kill her. Trenette screamed and ran toward a door. Defendant pulled his knife, and as he attempted to grab Trenette, he cut her wrist. When he caught Trenette he strangled her, and then undressed her. As he was about to carry her body into the bedroom Albert, Jr., who had been awakened by the noise, walked into the living room. Defendant grabbed the boy, choked him, and placed his body on the bed. He then carried Trenette's body into the bedroom and placed it on the bed next to Albert, Jr. Defendant walked over to the crib where Reshonda was sleeping and strangled her. He left Reshonda's body in the crib. He remained in the apartment for another half hour, until about 4 a.m. Defendant later disposed of the knife in a garbage dumpster.

John Salyers, a Chicago police officer, testified that upon arriving at the Anderson apartment at about 6:30 a.m., he observed Mister standing in front of the building in the company of police officers. Salyers and two other officers walked to the back door, where they noticed that the door appeared to have been forced open. They walked through the kitchen to the living room. From there Salyers observed Anderson in the bedroom holding a knife. Salyers drew his revolver. As he did so, Anderson looked up, and then began to make jabbing motions with the knife toward his own chest. Salyers ordered Anderson to drop the knife. He handcuffed Anderson and placed him in the kitchen. Salyers then returned to the bedroom, where he saw the body of one adult female and the bodies of two children on the bed. He later determined that the victims were Trenette, Reshonda and Albert, Jr. Trenette's body was partially nude. Sa-

lyers also found blood stains on the living room floor. An evidence technician was called to take photographs. Anderson and Mister were then transported to the police station.

Dr. Robert Stein, chief medical examiner of Cook County, testified that he performed autopsies on the bodies of the three victims on December 6, 1982. His examination of Trenette revealed contusions and abrasions about the neck, a puncture mark on the left breast, and incised wounds on the right wrist and upper right arm. He testified that the cause of Trenette's death was strangulation. Dr. Stein also found abrasions and contusions about the necks of Albert, Jr., and Reshonda. He testified that the cause of death of both children was strangulation.

Dale Sayset, special agent, Illinois Department of Law Enforcement, testified at trial that he received a telephone call from Troy Hattery, defendant's father, on January 18, 1983. Hattery told Sayset that he believed defendant was a witness to a triple homicide involving a woman and two children. The following day Sayset again spoke with defendant's father. The father agreed to arrange a meeting between defendant, who was in Texas, and Sayset. That same day Sayset learned that defendant was wanted for questioning in connection with the Anderson homicides and that there was an outstanding warrant for defendant's arrest on an unrelated aggravated-battery charge. The next day, on January 20, 1983, Sayset and another agent met defendant's father at O'Hare airport. Defendant's mother and sister also were present. When defendant's flight arrived shortly after 10:30 a.m., Sayset introduced himself to defendant, advised him that he was under arrest for aggravated battery and read him the *Miranda* warnings. Defendant was then transported to the State's Attorney's office. Sayset testified that he did not question defendant about

the homicides.

Timothy McMahon, who was an assistant State's Attorney, testified that he and another assistant began questioning defendant about noon on January 20. After defendant was advised of his constitutional rights, he initially told McMahon that he did not see the killings. He said that he was in the bathroom at the apartment when the killings occurred. When he exited the bathroom, defendant discovered that Mister was gone and that Trenette was dead. After a few minutes defendant fled the apartment. Defendant also related that he was a member of the Black Gangster Disciples and that he was the bodyguard of a person named Nimrod, a leader of a north side faction of the Disciples.

McMahon testified that he then confronted defendant with certain inconsistencies between defendant's initial story and the police reports. In response, defendant gave another version of what happened. In the second version, defendant stated that when he exited the bathroom he saw Mister strangling Trenette.

Thereafter, defendant was transported to the Chicago police department crime laboratory by Officer Chris Grogman. A short time later, Grogman was informed by a department laboratory technician that defendant wished to speak to him. As Grogman walked into the room where defendant was being held, defendant stated, "I did it, I'm sorry I caused you any trouble." Grogman told defendant that they would discuss the killings at the Area Six police headquarters. After arriving at Area Six headquarters and being advised of his constitutional rights, defendant told Grogman that he had killed Trenette and her two children.

At about 10 p.m., on January 20, 1983, defendant met with Assistant State's Attorney William Merritt. Defendant gave an oral statement to Merritt regarding his involvement in the killings. He then agreed to give a

statement, confessing to the killings, in the presence of a court reporter.

Defendant's first assignment of error concerns the conduct of his appointed trial counsel. He argues that the trial strategy employed by his trial counsel amounted to the functional equivalent of a guilty plea without the procedural due process safeguards required by *Boykin v. Alabama* (1969), 395 U.S. 238, 23 L. Ed. 2d 274, 89 S. Ct. 1709, and by our Rule 402 (87 Ill. 2d R. 402). Defendant further maintains that defense counsel's actions were totally inconsistent with his plea of not guilty and thus constituted a *per se* denial of the right to effective assistance of counsel guaranteed by the sixth amendment to the United States Constitution (U.S. Const., amend. VI).

The record indicates that defendant pleaded not guilty to the murder charges. At trial he was represented by two assistant public defenders. The prosecution, in its opening statement to the jury, outlined the allegations against defendant. The prosecution's opening statement described in detail the events of December 4, 1982, and in particular how defendant allegedly strangled Trenette Anderson and her two children. Immediately thereafter, one of defendant's trial attorneys made the following opening statement to the jury:

> "Ladies and gentlemen of the jury, he [defendant] did it. He did everything [the prosecution] just told you. He did it to save the lives of his own family, his mother and his sisters, because he knew that this man [Rufus Mister] would have killed them or had them murdered if he refused his orders. This man is a leader of the Diciples [*sic*] Street Gang. He and another man named Nimrod forced, ordered this man, Charles Hattery, to do what you heard [the prosecution] say he did.
>
> *We are not asking you to find Charles Hattery not guilty. At the end of your deliberations, you will find him guilty of murder. We are asking you to consider the evi-*

*dence that you hear today and in the next few days to explain why he did the horrible thing that he did. Once you have found him guilty, we will proceed and you will find him eligible for the death penalty. The question, and the only question facing you, will be whether to impose the death penalty on Charles Hattery for trying to save the life of his family.* Thank you." (Emphasis added.)

During the guilt-innocence phase of the trial, defense counsel advanced no theory of defense. They presented no evidence of their own, and chose not to make a closing statement to the jury. Instead, defense counsel attempted to develop on cross-examination the theory that defendant was compelled by Rufus Mister to kill the victims. Compulsion is not a defense to an offense punishable by death (see Ill. Rev. Stat. 1981, ch. 38, par. 7—11), but can, if the threat of death or bodily harm is imminent, constitute a mitigating circumstance sufficient to preclude the imposition of the death penalty. (See Ill. Rev. Stat. 1981, ch. 38, par. 9—1(c)(4).) In an effort to prove their compulsion theory, defense counsel elicited from prosecution witnesses the fact that defendant and Rufus Mister were members of the Black Gangster Disciples Street Gang; that defendant was a bodyguard to a Disciples' leader named Nimrod; that Mister was about to be appointed a general in the Disciples' organization by Nimrod; and that Mister threatened to harm defendant and his family if defendant refused to comply with Mister's orders to kill Trenette Anderson and her two children.

Defendant's attorneys also elicited from prosecution witnesses the fact that defendant, at the request of his parents, returned voluntarily from Texas and met with police after he learned that there was a warrant for his arrest, and that he had spoken to his family before confessing to police.

Several times during the guilt-innocence phase of the

trial, defendant's attorneys conceded that defendant was truthful when he confessed to the murders. Moreover, defense counsel, on more than one occasion, told the jury that the trial was a "death penalty case." The following colloquy took place between the trial judge and defense counsel in the presence of the jury:

"[DEFENSE COUNSEL]: I would ask leave at this time, *since this is a death penalty case, and the rule of—*

THE COURT: No, it is not a death penalty case. It is a finding of guilt, okay.

[DEFENSE COUNSEL]: May I have a sidebar, your Honor?

THE COURT: Despite [defense counsel's] opening statement." (Emphasis added.)

The State during closing argument emphasized the fact that defense counsel had conceded defendant's guilt. The prosecutor stated:

"Some of you might have been surprised yesterday a little bit when the Defense got up and said to you we agree that he did it, especially in light that this is a trial and in order to have a trial the defendant has to plead not guilty. You may be wondering why, why would a defendant come into court, take a trial and say I did it. It doesn't make sense unless of course someone is trying to con you, unless of course it is a trial tactic. He could have plead guilty and had a sentencing hearing but instead he took a trial and said I did it but they made me do it. *** Don't be fooled by them admitting it that they are telling you the truth, that if he says I committed these crimes then he must be telling the truth about the reason he did it."

Although the sixth amendment guarantees criminal defendants the right to the effective assistance of counsel (*McMann v. Richardson* (1970), 397 U.S. 759, 771 n.14, 25 L. Ed. 2d 763, 773 n.14, 90 S. Ct. 1441, 1449 n.14), courts ordinarily will not second-guess defense counsel's judgment and trial strategy. It is recognized

that the independence of defense counsel is essential to a fair trial. Moreover, it is also recognized that no two defense attorneys will necessarily agree on the same strategy for a particular case. Therefore, when evaluating ineffectiveness claims, courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance \*\*\*." *Strickland v. Washington* (1984), 466 U.S. 668, 689, 80 L. Ed. 2d 674, 694, 104 S. Ct. 2052, 2066.

The court in *Strickland* announced a two-part test for judging ineffectiveness claims. Under that test, a defendant must first show that his counsel's performance "fell below an objective standard of reasonableness." (466 U.S. 668, 688, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2065.) Defendant also must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. 668, 694, 80 L. Ed. 2d 674, 698, 104 S. Ct. 2052, 2068.

However, the court in *Strickland* also noted that there are some circumstances so likely to prejudice the accused that such prejudice need not be shown, but instead will be presumed. (466 U.S. 668, 692, 80 L. Ed. 2d 674, 696, 104 S. Ct. 2052, 2067.) In a companion case, *United States v. Cronic* (1984), 466 U.S. 648, 80 L. Ed. 2d 657, 104 S. Ct. 2039), the court emphasized that the sixth amendment requires, at a bare minimum, that defense counsel act as a true advocate for the accused. Where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable." (466 U.S. 648, 659, 80 L. Ed. 2d 657, 668, 104 S. Ct. 2039, 2047.) The court in *Cronic* explained:

"[T]he adversarial process protected by the Sixth Amendment requires that the accused have 'counsel acting in

the role of an advocate' [citation]. The right to the effective assistance of counsel is thus the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing. When a true adversarial criminal trial has been conducted—even if defense counsel may have made demonstrable errors—the kind of testing envisioned by the Sixth Amendment has occurred. But if the process loses its character as a confrontation between adversaries, the constitutional guarantee is violated." (466 U.S. 648, 656-57, 80 L. Ed. 2d 657, 666, 104 S. Ct. 2039, 2045-46.)

In *Francis v. Spraggins* (11th Cir. 1983), 720 F.2d 1190, *cert. denied* (1985), 470 U.S. ____, 84 L. Ed. 2d 835, 105 S. Ct. 1776, the petitioner was convicted of murder and rape in a Georgia court and sentenced to death on the murder conviction. Defense counsel conceded petitioner's guilt in his argument to the jury at the close of the guilt-innocence phase of petitioner's bifurcated trial. Subsequently petitioner filed a petition for a writ of *habeas corpus* in United States district court. The United States court of appeals affirmed the district court's award of a writ of *habeas corpus* on the ground that counsel's concession of his client's guilt constituted ineffective assistance of counsel. The court stated:

"Where a capital defendant, by his testimony as well as his plea, seeks a verdict of not guilty, counsel, though faced with strong evidence against his client, may not concede the issue of guilt merely to avoid a somewhat hypocritical presentation during the sentencing phase and thereby maintain his credibility before the jury. Even though an adverse verdict would have the effect of precluding further argument on the issue of guilt, counsel does not have license to anticipate that effect and to concede the issue during the guilt/innocence phase simply because an adverse verdict appears likely." 720 F.2d 1190, 1194.

Similarly, in *Wiley v. Sowders* (6th Cir. 1981), 647 F.2d 642, *cert. denied* (1981), 454 U.S. 1091, 70 L. Ed.

2d 630, 102 S. Ct. 656, the court upheld the award of a writ of *habeas corpus* where, during petitioner's State criminal trial for theft, burglary and being a persistent felony offender, his defense counsel admitted petitioner's guilt. The court in *Wiley* concluded that defense counsel's concession of guilt constituted ineffective assistance of counsel because it nullified petitioner's right to have the issue of guilt or innocence presented to the jury as an adversarial issue. The court explained:

"Unquestionably, the constitutional right of a criminal defendant to plead 'not guilty,' \*\*\* entails the obligation of his attorney to structure the trial of the case around his client's plea. \*\*\* In those rare cases where counsel advises his client that the latter's guilt should be admitted, the client's knowing consent to such trial strategy must appear outside the presence of the jury on the trial record in the manner consistent with *Boykin* [*v. Alabama* (1969), 395 U.S. 238, 23 L. Ed. 2d 274, 89 S. Ct. 1709].

Although statements made by attorneys in closing arguments are not evidence, nevertheless, for all practical purposes, counsel's admission of guilt on behalf of his client denied to petitioner his constitutional right to have his guilt or innocence decided by the jury. Petitioner, in pleading not guilty, was entitled to have the issue of his guilt or innocence presented to the jury as an adversarial issue. Counsel's complete concession of petitioner's guilt nullified the adversarial quality of this fundamental issue." (647 F.2d 642, 650.)

In similar cases, courts have held that the admission of an accused's guilt by his defense attorney violates the defendant's sixth amendment right to the effective assistance of counsel. See *Mullins v. Evans* (10th Cir. 1980), 622 F.2d 504; *State v. Wiplinger* (Minn. 1984), 343 N.W.2d 858; *People v. Fisher* (1982), 119 Mich. App. 445, 326 N.W.2d 537; *People v. Schultz* (1978), 85 Mich. App. 527, 271 N.W.2d 305; *People v. Carter* (1976), 41 Ill. App. 3d 425. *Cf. People v. Redmond* (1972), 50 Ill. 2d

313 (defense counsel's closing argument in which he admitted defendant's guilt constituted denial of due process).

After considering the actions of the defense counsel in the present case we are convinced that the prosecution's case was not subjected to the "meaningful adversarial testing" required by the sixth amendment. (*United States v. Cronic* (1984), 466 U.S. 648, 656, 80 L. Ed. 2d 657, 666, 104 S. Ct. 2039, 2045.) The concession of defendant's guilt by his attorneys was unequivocal. In the opening statement, one of defendant's attorneys told the jury, "We are not asking you to find Charles Hattery not guilty. *** [Y]ou will find him guilty of murder." Defense counsel told the jury that defendant did a "horrible thing," and then stated: "Once you have found him guilty, *** you will find him eligible for the death penalty." Then defense counsel stated that the *only* issue to be decided was whether defendant should receive the death penalty. The comments by defense counsel during the guilt-innocence phase that the trial was a "death penalty" case further impressed upon the jury the false notion that the guilt or innocence of the defendant was not at issue but, rather, had already been decided.

Defense counsel's trial strategy—which attempted to show that defendant was guilty of murder but undeserving of the death penalty—was totally at odds with defendant's earlier plea of not guilty. There is no evidence that defendant consented to his attorneys' strategy, and such consent will not be presumed from a silent record. (*Cf. Boykin v. Alabama* (1969), 395 U.S. 238, 244, 23 L. Ed. 2d 274, 280, 89 S. Ct. 1709, 1712-13.) As such, counsel's actions deprived defendant of the right of having the issue of his guilt or innocence presented to the jury as an adversarial issue.

The State argues that defense counsel's actions were sound strategic decisions because the evidence of defend-

ant's guilt was overwhelming. We disagree. Although counsel's strategy may have been reasonable in light of the evidence—a point we need not consider—it was an impermissible one. "[E]ven when no theory of defense is available, if the decision to stand trial has been made, counsel must hold the prosecution to its heavy burden of proof beyond reasonable doubt." (*United States v. Cronic* (1984), 466 U.S. 648, 656 n.19, 80 L. Ed. 2d 657, 666 n.19, 104 S. Ct. 2039, 2045-46 n.19.) Counsel may not concede his client's guilt in the hope of obtaining a more lenient sentence where a plea of not guilty has been entered, unless the record adequately shows that defendant knowingly and intelligently consented to his counsel's strategy. We therefore hold that defendant was denied the effective assistance of counsel in violation of the sixth amendment. Because we reverse defendant's murder convictions, we only address those other issues which might appear on remand.

Defendant next contends that the trial court should have suppressed the statements he gave to police and prosecutors, alleging that the statements were the product of an illegal arrest. He argues that the complaint, which was the basis of the arrest warrant for aggravated battery, did not supply the issuing judge with sufficient information to support a finding of probable cause. (See, *e.g.*, *Whiteley v. Warden of Wyoming State Penitentiary* (1971), 401 U.S. 560, 28 L. Ed. 2d 306, 91 S. Ct. 1031; *People v. Waitts* (1967), 36 Ill. 2d 467.) As such, he argues that the aggravated-battery warrant was invalid.

The record reveals that defendant filed a motion to suppress the statements prior to trial. A hearing was held on defendant's motion on July 14, 1983. At that hearing, defense counsel called two witnesses: Troy Hattery, defendant's father, and Dale Sayset, a special agent with the Illinois Department of Law Enforcement. The

substance of their testimony concerned the father's arrangements to have defendant meet with police and defendant's subsequent arrest at O'Hare airport on January 20, 1983. None of the evidence introduced at the suppression hearing by defense counsel had any bearing on the validity of the aggravated-battery warrant. Defense counsel also did not contest the validity of the arrest warrant in his argument on the motion. The record discloses that the whole focus of the suppression hearing was whether defendant's arrest for aggravated battery was a pretext to question defendant about the murders.

On a motion to suppress based on a lack of probable cause to arrest, the initial burden of going forward with the evidence is on the defendant. (*People v. Lyles* (1985), 106 Ill. 2d 373, 387; *People v. Black* (1972), 52 Ill. 2d 544, 553-54.) The record shows that defendant did not present any evidence whatsoever regarding the validity of the aggravated-battery warrant. The defense thus failed to carry its burden of going forward with the evidence and its initial burden of proof. The State's failure to present evidence on the issue of probable cause to arrest for aggravated battery was obviously the result of defendant's failure to meet his initial burden. (*Cf. In re Lamb* (1975), 61 Ill. 2d 383, 387.) Under the circumstances, we hold that defendant has waived the issue.

Defendant also argues that the trial court erred in refusing to suppress his statements as the product of a pretext arrest. The gist of defendant's argument is that police arrested him on the aggravated-battery warrant as a subterfuge to interrogate him about the Anderson homicides. He maintains that the conduct complained of violated the fourth amendment to the United States Constitution (U.S. Const., amend. IV) and article I, section 6, of our State Constitution's bill of rights. Ill. Const. 1970, art. I, sec. 6.

Defendant attempted to show at the suppression

hearing that the statements given to police and prosecutors were the product of the alleged pretext arrest. In support of the motion, defendant called two witnesses. Special Agent Dale Sayset testified that he received a telephone call from Troy Hattery, defendant's father, on January 18, 1983. Hattery told Sayset that he believed defendant was a witness to a triple homicide involving a woman and two children. Sayset told Hattery that he would look into the matter and call him back. The next day, January 19, 1983, Sayset called defendant's father. The latter agreed to arrange a meeting between defendant, who was in Texas, and Sayset. Later that day, Sayset spoke to a Chicago police detective. He was told by the detective that defendant was wanted for questioning in connection with a triple homicide and also that there was an outstanding warrant for defendant's arrest on the aggravated-battery charge. Sayset picked up the warrant from Chicago police.

On January 20, 1983, Sayset and another agent met defendant's father, mother and sister at O'Hare airport. Defendant's father directed the agents to the airline gate where defendant's flight was due to arrive. When defendant's flight arrived shortly after 10:30 a.m., Sayset introduced himself to defendant, advised him that he was under arrest for aggravated battery, and read him the *Miranda* warnings. Sayset then transported defendant to the Cook County State's Attorney's office. He testified that he did not question defendant about the homicides.

The testimony of defendant's father was substantially the same as Sayset's. He also testified that he received a telephone call from defendant on January 19, 1983. During that call, the father told defendant that he should return to Chicago because there was a warrant for his arrest. He did not tell defendant what the arrest warrant charged.

At the close of the evidence, the trial court denied the motion to suppress. After considering all the evidence which was presented to the trial court, we agree that the motion to suppress should have been denied. The only evidence introduced at the suppression hearing indicated that defendant's father arranged to have Sayset meet defendant at O'Hare airport; that prior to the meeting Sayset learned that there was an outstanding warrant for defendant's arrest; that defendant was wanted for questioning with regard to the Anderson homicides; and that upon meeting defendant Sayset arrested him for aggravated battery. The evidence, without more, was insufficient to show that defendant was arrested on a subterfuge warrant. A trial court's ruling on a motion to suppress will not be disturbed unless it is manifestly erroneous. (*People v. Hoskins* (1984), 101 Ill. 2d 209, 212; *People v. Holloway* (1981), 86 Ill. 2d 78, 91; *People v. Williams* (1974), 57 Ill. 2d 239, 246, *cert. denied* (1974), 419 U.S. 1026, 42 L. Ed. 2d 302, 95 S. Ct. 506.) Based on the evidence presented to the trial court, we cannot say that its ruling on this issue was manifestly erroneous.

For the reasons stated, defendant's convictions for murder are reversed and his death sentence is vacated. The cause is remanded to the circuit court of Cook County for a new trial.

*Judgment reversed;*
*sentence vacated;*
*cause remanded.*

JUSTICE MILLER, dissenting:

Accepting both the defendant's alternative arguments against the trial strategy followed here, the majority presumes that the defendant was prejudiced by the strategy and that his consent to it must appear on the record. I do not believe that either conclusion is re-

quired, and accordingly I dissent.

The right to the effective assistance of counsel "is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial." (*United States v. Cronic* (1984), 466 U.S. 648, 658, 80 L. Ed. 2d 657, 667, 104 S. Ct. 2039, 2046.) Ordinarily, then, a defendant must show that he has been prejudiced by counsel's deficient performance, though there are "circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." (466 U.S. 648, 658, 80 L. Ed. 2d 657, 667, 104 S. Ct. 2039, 2047.) When the adversarial process breaks down—when, for example, counsel is denied, or utterly fails to contest the State's case, or, because of attendant circumstances, finds it impossible to provide adequate representation—then prejudice may be presumed. (See 466 U.S. 648, 660-61, 80 L. Ed. 2d 657, 668-69, 104 S. Ct. 2039, 2047-48.) The likelihood of prejudice in those cases is so great "that case by case inquiry into prejudice is not worth the cost." (*Strickland v. Washington* (1984), 466 U.S. 668, 692, 80 L. Ed. 2d 674, 696, 104 S. Ct. 2052, 2067.) Generally, too, the impairment is something for which the government is responsible and therefore can prevent. (466 U.S. 668, 692, 80 L. Ed. 2d 674, 696, 104 S. Ct. 2052, 2067.) In neither *Cronic* nor *Strickland,* however, did the Supreme Court presume prejudice. In *Cronic,* a prosecution for mail fraud stemming from a check-kiting scheme, the Supreme Court rejected the inference by the court of appeals that counsel had been ineffective; that inference had been based on several circumstances, including the length of time counsel had had to prepare for the case, counsel's youthfulness, and his principal expertise in a different area of law. In *Strickland* the court held that, in the circumstances there, counsel's failure to present at a capital sentencing hearing additional character or

psychological evidence regarding the defendant was neither a deficiency in performance nor a matter resulting in actual prejudice to the defendant.

I do not believe that this case implicates any of the concerns identified by the Supreme Court as warranting a presumption of prejudice. The adversarial process did not break down here. Defense counsel's strategy was not a matter that the prosecutor or trial judge devised. The primary issue in the proceedings was not whether the defendant was guilty of offenses punishable by death, but whether he should be sentenced to death. In this regard, I would note that on appeal here the defendant has not challenged the sufficiency of the evidence of his guilt. That evidence was overwhelming—it included the defendant's confessions to these gruesome crimes—and trial counsel may well have concluded that the strategy used here was a reasonable course to follow.

Going to trial preserved for the defendant matters that a guilty plea necessarily would have waived. One of the most significant of those was the ruling on his suppression motion, and the majority's treatment of that issue demonstrates the value of preserving it for review. Moreover, although compulsion is not a defense to the crimes charged here (see Ill. Rev. Stat. 1981, ch. 38, par. 7—1), it may, as a mitigating circumstance, preclude a sentence of death (see Ill. Rev. Stat. 1981, ch. 38, par. 9—1(c)(4)), and defense counsel used the trial to develop a theory of compulsion in a way that would not have been practicable at a sentencing hearing. The defendant was tried jointly with Rufus Mister, the person who, counsel argued, compelled the defendant to commit the murders. The presence of the codefendant, charged on a theory of accountability for the same crimes, was used to strengthen the defendant's claim of compulsion. Also, through cross-examination of the State's witnesses at trial, defense counsel brought out information tending to

support the theory that defendant's role in the crimes was compelled by Mister.

In several ways, then, the jury was educated, as it were, on the defendant's evidence in mitigation through information and impressions that could not have been duplicated at a sentencing hearing. Counsel may have believed, though, that the surest way to preserve credibility before the jury for his later argument, that the death sentence should not be imposed, was to acknowledge that the defendant had committed offenses for which a sentence of death could be imposed. What occurred here was analogous to the common practice in jury trials of acknowledging guilt of one offense to avoid conviction for another. To a similar end, counsel may have reasonably believed here that the strategy adopted at the trial and sentencing hearing was more likely to prevent a sentence of death than any other course of defense.

Moreover, this choice of strategy was not inconsistent with anything that the defendant himself did or said at trial. In this regard I would note that in a number of the cases cited by the majority, acknowledgments of guilt by counsel were, indeed, contradicted by the defendants. See *Francis v. Spraggins* (11th Cir. 1983), 720 F.2d 1190 (defendant testified, denying that he committed the crime or that he made statements to the police, but counsel later conceded defendant's guilt to jury, asking for a sentence other than death); *People v. Fisher* (1982), 119 Mich. App. 445, 326 N.W.2d 537 (defendant testified in support of his insanity defense, but in closing counsel asked instead for finding of guilty but mentally ill); *State v. Wiplinger* (Minn. 1984), 343 N.W.2d 858 (counsel, in cross-examination of State's witnesses, effectively conceded defendant's identity as person involved in offense; defendant interrupted the trial and voiced his objection to that); *cf. Mullins v. Evans* (10th Cir. 1980), 622 F.2d

504 (fearful that defendant's parole eligibility date under trial judge's sentence for conviction for lesser offense would be later than under mandatory life term for conviction for greater offense, counsel "threw the fight" and did whatever was possible to ensure conviction for greater offense; trial found to be a sham, and therefore defendant's acquiescence to strategy was unimportant).

Finally, the proceedings here were not tantamount to a guilty plea, and the defendant was not required to be admonished of his trial rights, in the manner of our Rule 402 (87 Ill. 2d R. 402), when defense counsel's strategy became evident. Unlike *People v. Smith* (1974), 59 Ill. 2d 236, and *People v. Stepheny* (1974), 56 Ill. 2d 237, defense counsel did not make an agreement with the prosecutor regarding the outcome of the case or stipulate to the sufficiency of the evidence of the defendant's guilt. Instead, defense counsel required the State to put on its witnesses, remaining free to challenge the sufficiency of the State's evidence, and counsel did so, moving for a directed verdict at the close of the State's case. Moreover, counsel moved to suppress the defendant's confession. See *People v. Sampson* (1985), 130 Ill. App. 3d 438, and *People v. Fair* (1975), 29 Ill. App. 3d 939 (in stipulated bench trials, presentation of factual or legal defense, including motion to suppress confession, renders unnecessary admonitions regarding trial rights).

Because the adversarial process did not break down here, I believe that an inquiry into prejudice is worth the cost. I would not presume that the defendant was prejudiced by trial counsel's choice of strategies, nor would I presume that the choice was made without the defendant's consent. Instead, I would require in this case that the defendant establish that the strategy was adopted without his consent or, failing that, that he was prejudiced by trial counsel's representation.

Whether the trial strategy should have been permit-

ted is not the question here; the question is whether the strategy was without the defendant's consent or was prejudicial to him. The defendant should not be permitted now to question the trial strategy, which allowed him to preserve pretrial issues for appeal, test the legal sufficiency of the State's case, and offer mitigating evidence in the guilt-or-innocence phase, while at the same time attempting to maintain his credibility with the jury, without a showing on his part of his lack of consent to the strategy, or of prejudice to him.