THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
DANNY LABOSETTE, a/k/a Danny Ott, Defendant-Appellant.

Fourth District   No. 4—91—0729

Opinion filed November 5, 1992.

Daniel D. Yuhas and Lawrence J. Essig, both of State Appellate Defender's Office, of Springfield, for appellant.

Charles Colburn, State's Attorney, of Jacksonville (Norbert J. Goetten, Robert J. Biderman, and Elliott Turpin, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE McCULLOUGH delivered the opinion of the court:

Defendant Danny Labosette was convicted of two counts of first degree murder (Ill. Rev. Stat. 1989, ch. 38, pars. 9—1(a)(1), (a)(3)) of the victim John Barfield. The jury found defendant eligible for the death penalty because it found defendant committed the murder "in a cold, calculated and premeditated manner pursuant to a preconceived plan, scheme or design to take a human life by unlawful means." (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(b)(10).) However, the jury concluded defendant was not to be sentenced to death and the trial court imposed a sentence of 50 years' imprisonment. Defendant appeals, contending (1) he was denied the effective assistance of counsel when his trial counsel conceded his guilt without his consent; (2) the prosecutor committed reversible error in closing argument by repeatedly commenting on the trial court's ruling that defendant was not entitled to a second degree murder instruction; (3) the aggravating factor that the murder was committed in a cold, calculated, and premeditated manner is unconstitutionally vague; and (4) the sentence of 50 years' imprisonment was excessive. We affirm.

Patricia Hennessy testified that on Thursday, November 29, 1990, at approximately 7:55 p.m., she was in the Blue Ridge Trailer Court in Franklin, Illinois, sitting in the victim's car with her sister Joyce Hennessy. She stated the victim was attempting to put jumper cables on the battery of his car and her car in order to jump start his car. While she was sitting in the victim's car, she saw defendant's truck pull up and defendant exit the truck. Defendant exited the truck, walked around it and then shot the victim three times. Defendant did not say anything to the victim before he shot him. Patricia was approximately four feet away from defendant and the victim. She knew defendant before this night as she had previously met him at a local tavern. After defendant shot the victim, he walked back to his truck, got into the driver's seat and drove away.

Joyce Hennessy testified the same as her sister as to the events of November 29, 1990. She testified further that defendant shot the victim twice and then, as the victim was trying to crawl under his car, he shot the victim again in the back. Defendant then got into his truck and left the scene at a high rate of speed.

Dale Ater was also in the Blue Ridge Trailer Court on Thursday, November 29, 1990, at approximately 7:55 p.m. He witnessed the last shot defendant fired at the victim. Earlier that evening he had been in his trailer with Patricia Hennessy, Joyce Hennessy, her boyfriend and her daughter, who needed a ride back out to Franklin. Ater testified the victim stated they could use his car and they went out of the trailer to try to start the car. However, the car would not start, so the victim removed a jumper battery from his car in order to jump start the car. The next thing he saw was defendant's pickup truck pull up next to the victim's car. Ater was inside his trailer at this time when another person in the trailer said to him, "Whose truck is that?" Ater stated he did not know and he started toward the door. When he was approximately three feet from the door, he heard two shots and, as he got onto the porch of his trailer, he saw the victim falling down. The victim attempted to scoot under his car and defendant then shot the victim in the back. Defendant then looked at Joyce Hennessy, looked at another person near the truck and then nonchalantly walked around to his truck, got into it and drove away.

Bob Morris was at the Blue Ridge Trailer Court on that day and he first heard defendant's truck go up to a trailer owned by Terry Stout. Defendant left Terry Stout's house, came back down the street toward the trailer park exit and then backed up a little bit because he saw the victim's car. Defendant got out of his truck, looked at the victim, shot him three times, and then got into his truck and sped away from the scene. Morris got into his car and attempted to follow defendant to see where he was going.

Terry Stout testified that at approximately 7:30 p.m. on November 29, 1990, defendant came to his trailer in the Blue Ridge Trailer Court. Stout knew defendant because defendant dated a girl, Melissa Hare, who resided with Stout at his trailer. Defendant came to the trailer looking for the victim but was told the victim was not present in the trailer. However, defendant kept looking around to see if the victim was hiding inside the trailer. Defendant then began to leave and told Stout that he would be back. He got into his truck and headed toward the end of the trailer court. Approximately a few seconds later, after he watched defendant drive away from his trailer,

Stout heard three shots. However, he did not see the shooting. He got dressed and went outside to see what had happened.

Stout testified that at 1:30 a.m. the previous day, defendant had come by his trailer looking for the victim. At that time he, his wife, his son, Melissa Hare, and her three children, the victim and another person were all at the trailer. He heard the victim and defendant arguing, although he could not clearly hear what they were arguing about. He testified he heard the victim tell defendant to come back tomorrow and they would talk when the defendant was sober. He also heard some scuffling noise in the room where they were. Stout testified defendant was very jealous about Melissa Hare and did not like it when other men talked to her.

Martha Stout, Terry Stout's wife, testified defendant came to their trailer on the evening of November 29 at approximately 7:30 p.m. looking for the victim. After defendant had been told the victim was not present in the trailer, she saw defendant drive down to the end of the road and then back up and make a left-hand turn. The next thing she heard was three gun shots. She then left the trailer to go over and see what had happened and she saw the victim lying on the ground. She also testified that at approximately 1:30 a.m., the previous morning, defendant was at the trailer fighting with the victim. She stated they were fighting about Melissa Hare and the victim stated that Melissa was not his girlfriend and that if defendant wanted her, he could come back when he was sober and they would talk about it. She also heard a bunch of crashing around in the kitchen and then defendant left the trailer. She testified defendant had once threatened to kill anybody that got near Melissa Hare, except Melissa's husband.

Melissa Hare testified that she knew defendant because they had dated for approximately one week; however, the relationship had ended two days before the shooting. She testified defendant came to the trailer on November 29, 1990, looking for the victim. When he found out the victim was not there, he left the trailer and the next thing she heard was three shots. The people she was in the trailer with at the time ran outside and then ran back and told her that the victim had been shot.

At 1:30 a.m. the previous morning, defendant had come by the trailer where she was sleeping and wanted to talk to her. He had stated that if it was over between them, that she should just say so, and he would leave her alone. She told him it was over but he refused to leave and, after a little while, the victim and another person came into the trailer. The victim and defendant went into the kitchen and

then she heard some noises and she also heard them shoving each other. She stated the victim shoved defendant toward the door but defendant refused to leave. Finally, the victim opened the door and shoved defendant out.

Kevin Cowden testified that at approximately 8 or 8:30 p.m. on November 29, defendant showed up at his house and asked if he could hide his truck in Cowden's garage. Defendant explained to Cowden that he had been in a fight and that there were men chasing him and he wanted to hide from them. Cowden put defendant's truck in the garage, where it remained until the police came and took it away. Defendant left his house approximately 20 to 25 minutes after putting the truck in the garage.

Eric Scoggins testified that at about 2 a.m. on November 29, 1990, defendant came by his house. Defendant stated he had gotten into a fight with the victim and somebody else and that defendant had a black eye. Defendant sat down on the chair and said, "I'm going to kill him, I'm going to kill him." This was in reference to the victim. Scoggins told defendant to shut up and go to sleep. Defendant stated approximately three times he was going to kill the victim. He spent the night at Scoggins' house and woke up the next morning between 10:30 and 11 a.m. Upon waking, defendant again stated a couple of times that he was going to kill the victim and he even made up a song about it. At this point, defendant also asked Scoggins for a gun. This was the last time Scoggins ever saw defendant.

The State presented evidence, through the testimony of Dr. John Dietrich, regarding the three bullet wounds in the victim's body. Dietrich explained that there were three bullet wounds: one in the chest, one near the arm toward the back, and a third in the back. Dr. Dietrich testified that the wound which entered on the victim's left side toward the arm, passed through the victim's heart, which caused a great blood loss. All of these wounds were potentially fatal, but the wound passing through the heart was the most serious.

Defendant presented evidence that he was a heavy drinker and that sometimes he drank and forgot the next day what he had done. The nurse at the Morgan County jail testified that on the Monday morning following defendant's Friday night arrest, she examined defendant and he appeared to be going through some symptoms of alcohol and drug withdrawal. The defense also presented testimony of two clinical psychologists, Dr. Sue Moriearty and Ronald Gottschalk, regarding defendant's alcoholism and ability to retain intense anger or emotional distress for a period longer than the average person.

Closing arguments were made by both counsel, and the parties had a jury instruction conference with the trial court. The defense tendered a jury instruction regarding second degree murder based on "a sudden and intense passion resulting from serious provocation" (Ill. Rev. Stat. 1989, ch. 38, par. 9—2(a)(1)), which was refused by the trial court. The court concluded the retaliation by defendant toward the victim from any physical assault the previous evening was out of proportion to any provocation created by the assault and, as a matter of law, a sufficient time had passed for him to cool down. Accordingly, the second degree murder instruction was refused. The jury was instructed on first degree murder and it took less than one hour to convict defendant on both counts.

During the first stage of the death penalty hearing, the jury concluded defendant was eligible for the death penalty because the murder was committed in "a cold, calculated and premeditated manner pursuant to a preconceived plan, scheme or design to take a human life by unlawful means." (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(b)(10).) However, at the second stage of the death penalty hearing, the jury refused to sentence defendant to death. Accordingly, the court sentenced defendant to 50 years' imprisonment and he now appeals.

For his first issue, defendant contends he was denied the effective assistance of counsel because his trial attorney conceded his guilt during his opening statement. Defense counsel stated:

"We do not dispute that Danny Labosette shot John Barfield, nor do we maintain that the shooting was an accident. It was in all probability an intentional act, at least within the capability of this defendant to have intended to have done anything at that point in time. However, your analysis of the facts should not stop with that finding. You must not merely decide that he did it and stop at that. Your job, once you have determined that Danny Labosette in fact murdered John Barfield, if you make that determination, will be to go on to determine whether at the time of that murder Danny Labosette was acting under a sudden and intense passion resulting from a serious provocation on the part of the victim, John Barfield. In other words, did he shoot John Barfield because he was extremely upset about something that John Barfield had done to him. *** But the answer is, I'm not talking about whether Danny Labosette is guilty or not. Nor am I talking about whether he should be excused for his actions. Danny Labosette did a terrible thing. He committed the ultimate offense against another human being, and he should pay the consequences of those actions. How-

ever, the question before you is not whether Danny Labosette is guilty of murder. The question which you as jurors must determine is what kind of murder was this. *** The question I have to present to you at this time was whether Danny Labosette is, in fact, guilty of first degree murder as he is being charged or whether he is some, guilty of some lesser offense, specifically the offense of second degree murder, which as I indicated, you will be instructed upon when you retire to consider your verdict following the close of this trial. *** We further believe the evidence will show that he subsequently found John Barfield and, in fact, shot him to death. It is our position that this final act on the part of Danny Labosette is basically the final, relevant fact of this trial, and is in reality something about which there is no disagreement. *** We do not dispute that Danny Labosette shot John Barfield. *** A murder was committed. Danny Labosette, in all probability, committed that murder."

Defendant suggests his trial counsel's strategy was *per se* ineffective pursuant to *People v. Hattery* (1985), 109 Ill. 2d 449, 488 N.E.2d 513. Alternatively, defendant argues his trial counsel was ineffective under the general standard announced in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052.

The State responds by distinguishing *Hattery* based on the difference between defense counsel's conduct in that case and the defense counsel's conduct in the present case. Additionally, the State suggests defense counsel's theory, *i.e.*, to rely on second degree murder, was a matter of trial strategy which is not a basis for a claim of ineffective assistance of counsel.

In *Hattery*, defendant was convicted of the murders of a woman and her two children. At the death penalty hearing, the jury found the necessary aggravating factors existed and there were no mitigating circumstances sufficient to preclude the imposition of the death penalty. The trial court sentenced defendant to death and he subsequently brought an appeal. On appeal, defendant contended the trial strategy of his counsel amounted to the functional equivalent of a guilty plea without the proper procedural due process safeguards. Defendant further contended his trial counsel's actions were totally inconsistent with his not guilty plea and thus constituted a *per se* denial of the right to effective assistance of counsel.

Defendant Hattery was represented by two assistant public defenders. One of his attorneys made the opening statement on his behalf, part of which was as follows:

" 'We are not asking you to find Charles Hattery not guilty. At the end of your deliberations, you will find him guilty of murder. We are asking you to consider the evidence that you hear today and in the next few days to explain why he did the horrible thing that he did. Once you have found him guilty, we will proceed and you will find him eligible for the death penalty. The question, and the only question facing you, will be whether to impose the death penalty on Charles Hattery for trying to save the life of his family. Thank you.' " (Emphasis omitted.) *Hattery*, 109 Ill. 2d at 458-59, 488 N.E.2d at 516.

The supreme court noted that defense counsel advanced no theory of defense during the guilt-innocence phase of the trial, nor did they present any evidence or make a closing statement. Rather, their entire theory of defense was to establish, through cross-examination of the State's witnesses, that defendant was compelled to kill the victims by a codefendant even though compulsion was not a legal defense. Moreover, at various times during the guilt-innocence phase of the trial, the defense counsel conceded defendant was truthful when he confessed to the murders. *Hattery*, 109 Ill. 2d at 459-60, 488 N.E.2d at 516.

In concluding defendant was denied the effective assistance of counsel, the *Hattery* court first found that the actions of defense counsel did not amount to the "meaningful adversarial testing" required by the sixth amendment. (*Hattery*, 109 Ill. 2d at 464, 488 N.E.2d at 518.) The court further noted that defense counsel's concessions of defendant's guilt were unequivocal. Finally, the court concluded defense counsel's strategy of attempting to show that defendant was guilty of murder but undeserving of the death penalty was totally at odds with his earlier plea of not guilty. In the absence of evidence that defendant consented to the trial strategy, the court refused to presume his consent. Thus, the court concluded defense counsel's actions deprived him of the right of having his guilt or innocence presented to the jury as an adversarial issue. *Hattery*, 109 Ill. 2d at 464, 488 N.E.2d at 518-19.

In *People v. Johnson* (1989), 128 Ill. 2d 253, 538 N.E.2d 1118, the court stated that the rule in *Hattery* must be narrowly construed and defendant has a high burden before he can forsake the two-part *Strickland* test. (*Johnson*, 128 Ill. 2d at 269-70, 538 N.E.2d at 1125.) The court further found that it did not hold in *Hattery* that it is *per se* ineffectiveness whenever the defense attorney concedes his client's guilt of offenses in which there is overwhelming evidence of that guilt

but fails to show on-the-record consent by defendant. *Johnson,* 128 Ill. 2d at 269, 538 N.E.2d at 1124-25.

■ Defense counsel's actions in this case indicate he did not fail to subject the prosecution's case to a meaningful adversarial testing as did defense counsel in *Hattery.* First, defense counsel did not *unequivocally* concede defendant's guilt. Defense counsel conceded defendant shot the victim but only in the context of hoping for a second degree murder instruction. Defense counsel did not concede defendant's guilt to first degree murder.

The evidence was overwhelming that defendant did in fact shoot the victim. Four eyewitnesses testified they saw defendant shoot the victim. Defense counsel would have lost all credibility with the jury if he attempted to argue defendant did not shoot the victim. Furthermore, unlike in *Hattery,* defense counsel did present evidence on defendant's behalf, namely a theory of second degree murder based on serious provocation. Counsel presented evidence of an altercation between defendant and the victim on the evening before the shooting as well as evidence that defendant threatened to kill the victim. Evidence was presented that defendant woke up the morning of the shooting and was still mad at the victim and still wanted to kill him. Expert testimony was presented to suggest that defendant may retain intense anger and passion longer than most people because of his alcohol abuse.

Defense counsel vigorously cross-examined the State's witnesses and objected to improper parts of their testimony. He made a closing argument, which—after explaining to the jury the absence of a second degree murder instruction—asked it to find the defendant not guilty of first degree murder. Thus, defense counsel cannot be found to have been *per se* ineffective. Therefore, the two-part test of *Strickland* must be applied to determine whether there has been ineffective assistance of counsel.

Ordinarily, to prevail on a claim of ineffective assistance of counsel, a defendant must show that (1) counsel's representation fell below an objective standard of reasonableness and (2) counsel's substandard representation so prejudiced the defense as to deny him a fair trial. (*People v. Horton* (1991), 143 Ill. 2d 11, 23, 570 N.E.2d 320, 325.) To show actual prejudice, defendant must establish that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. (*Strickland,* 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.) A reviewing court does not have to determine whether coun-

sel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. *People v. McCarthy* (1991), 213 Ill. App. 3d 873, 886, 572 N.E.2d 1219, 1227.

■ Even without deciding that counsel's remarks during his opening statement fell below an objective standard of reasonableness, defendant cannot show he was so prejudiced by these comments that he was denied a fair trial. Four eyewitnesses testified they saw defendant drive up to the victim, get out of his truck, fire three shots, and then drive away. The evidence was so overwhelming that even without defense counsel's statements acknowledging defendant shot the victim, the jury could still have so concluded.

Likewise, it cannot be said that counsel's remarks fell below an objective standard of reasonableness. Allegations arising from matters of judgment or trial strategy will not support a claim of ineffective assistance of counsel. The decision to rely on one theory of defense to the exclusion of other theories is a matter of trial strategy. (*People v. Clark* (1991), 207 Ill. App. 3d 439, 450, 565 N.E.2d 1373, 1380.) Given the number of eyewitnesses to this murder, defense counsel's one viable strategy was to urge a defense in an attempt to reduce the possible conviction from first degree murder to second degree murder. Defense counsel chose this defense of "sudden and intense passion resulting from serious provocation" when it became clear that the evidence would not support a defense of insanity or intoxication. Thus, since defense counsel's remarks were part of his trial strategy, they cannot form a basis for an ineffective assistance of counsel claim.

Next, defendant alleges the prosecutor committed reversible error by commenting during closing argument on the trial court's ruling that he was not entitled to a second degree murder instruction. The State contends defendant has waived this issue because of a failure to object to the comments at trial or raise them in a post-trial motion. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1130.) The State further contends the prosecutor's comments do not rise to the level of plain error because the evidence was not closely balanced and defendant was not denied a fair trial. *People v. Whitehead* (1987), 116 Ill. 2d 425, 448, 508 N.E.2d 687, 695.

■ Since defendant failed to object to these comments at trial and also failed to raise the issue in his post-trial motion, he has waived the resolution of the issue by this court unless the comments amount to plain error.

The prosecutor's comments do not rise to the level of plain error. First, as previously noted, the evidence was not closely balanced. Four eyewitnesses testified to the shooting. Another witness testified

that approximately 17 hours had passed between when defendant first stated he wanted to kill the victim and when he actually shot the victim. The trial court concluded defendant was not entitled to a jury instruction on second degree murder because as a matter of law there was no serious provocation and defendant had had a sufficient cooling-off period.

Likewise, defendant was not denied a fair trial by the prosecutor's statements. The prosecutor simply explained to the jury that it would not be receiving an instruction from the trial court regarding second degree murder because the court had determined the evidence was insufficient to support such an instruction. This may have helped alleviate any confusion on the jury's part because of comments of defense counsel during opening statement regarding this defense. The prosecutor did not misstate the law; rather, he stated that since there would be no second degree murder instruction, the jury had only two options: find defendant guilty of first degree murder or not guilty. Defense counsel invited this explanation of the absence of the second degree murder instruction because in his opening statement he made reference to this theory.

Finally, the jury was instructed that closing arguments made by counsel were not evidence and that any argument or statement made by counsel not based on the evidence should be disregarded. This instruction has been held to cure any prejudice to the defendant because of the prosecutor's improper remarks. (*People v. Lawler* (1991), 142 Ill. 2d 548, 565, 568 N.E.2d 895, 903.) Thus, any error made by these statements was cured by this instruction.

Third, defendant asserts the aggravating factor set forth in section 9—1(b)(10) of the Criminal Code of 1961 (Code) (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(b)(10)) is unconstitutionally vague under the eighth and fourteenth amendments to the United States Constitution (U.S. Const., amends. VIII, XIV). Defendant suggests the words "cold, calculated and premeditated" (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(b)(10)) are open to many interpretations and thus do not provide a principled way to distinguish a case where the factor is used to impose the death penalty from one where death is not imposed. Defendant concludes his case must be remanded for resentencing because the trial court considered an improper aggravating factor.

Section 9—1(b)(10) of the Code provides:

"(b) Aggravating Factors. A defendant who at the time of the commission of the offense has attained the age of 18 or more and who has been found guilty of first degree murder may be sentenced to death if:

\* \* \*

(10) the murder was committed in a cold, calculated and premeditated manner pursuant to a preconceived plan, scheme or design to take a human life by unlawful means, and the conduct of the defendant created a reasonable expectation that the death of a human being would result therefrom." Ill. Rev. Stat. 1989, ch. 38, par. 9—1(b)(10).

Section 5—8—1(a)(1)(a) of the Unified Code of Corrections provides that the sentence of imprisonment for first degree murder shall not be less than 20 years and not more than 60 years. (Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—1(a)(1)(a).) Moreover, "if the court finds that the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty or that any of the aggravating factors listed in subsection (b) of Section 9—1 of the Criminal Code of 1961 are present, the court may sentence the defendant to a term of natural life imprisonment." Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—1(a)(1)(b).

At the first phase of the death penalty hearing, the jury concluded defendant was eligible for the death penalty because it found "defendant was 18 years or older at the time of the murder for which he was convicted in this case and we unanimously find beyond a reasonable doubt that the statutory aggravating factor exists." At the sentencing hearing, the trial court found defendant committed the murder in a cold and calculated manner because 17 hours had passed between the first threat to kill the victim and the actual commission of the crime. The court specifically found that since it could consider the statutory aggravating factor in section 9—1(b)(10) of the Code to support a term of natural life, it was rational to consider that factor when determining what sentence should be imposed in the range of 20 to 60 years. The court concluded it would consider that factor in sentencing defendant.

Defendant relies upon the United States Supreme Court decision in *Maynard v. Cartwright* (1988), 486 U.S. 356, 100 L. Ed. 2d 372, 108 S. Ct. 1853, as support for his proposition that this provision is unconstitutional. In *Maynard*, the Supreme Court found that an aggravating circumstance which made a defendant eligible for the death penalty if the murder was " 'especially heinous, atrocious, or cruel' " was unconstitutionally vague as it applied to that defendant because it failed to sufficiently guide or limit the discretion of the sentencer. (*Maynard*, 486 U.S. at 360, 100 L. Ed. 2d at 379, 108 S. Ct. at 1857, quoting *Cartwright v. Maynard* (10th Cir. 1987), 822 F.2d 1477, 1491.) The Supreme Court explained that "our cases have insisted

that the channeling and limiting of the sentencer's discretion in imposing the death penalty is a fundamental constitutional requirement for sufficiently minimizing the risk of wholly arbitrary and capricious action." (*Maynard*, 486 U.S. at 362, 100 L. Ed. 2d at 380, 108 S. Ct. at 1858.) The Court believed the wording of the Oklahoma statute was vague because "an ordinary person could honestly believe that every unjustified, intentional taking of human life is 'especially heinous.'" *Maynard*, 486 U.S. at 364, 100 L. Ed. 2d at 382, 108 S. Ct. at 1859.

In *People v. Odle* (1988), 128 Ill. 2d 111, 538 N.E.2d 428, the Illinois Supreme Court upheld as constitutional section 9—1(b)(7) of the Code, which made a defendant eligible for the death penalty if "the murdered individual was under 12 years of age and the death resulted from exceptionally brutal or heinous behavior indicative of wanton cruelty." (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(7).) The court viewed this section as more specific in describing the conduct which qualifies an accused for the death penalty than the one deemed unconstitutional in *Maynard*. The court also found the statute was not susceptible to arbitrary application when the requirements of the statute were strictly followed. (*Odle*, 128 Ill. 2d at 140, 538 N.E.2d at 440.) The court concluded the provision was not facially invalid nor was it applied by the trial court in an arbitrary or capricious manner. The court noted that not only must the victim have been under the age of 12 and the conduct which brought about the death exceptionally brutal or heinous, the conduct must also be indicative of wanton cruelty. Defendant there had strangled his brother with a pajama bottom such that his neck was reduced to the size of an adult man's wrist. The court stated this behavior "can only be described as exceptionally brutal or heinous behavior, indicative of wanton cruelty." *Odle*, 128 Ill. 2d at 141, 538 N.E.2d at 441.

■ Likewise, the section here is not facially unconstitutional, nor was it applied by the trial court in an arbitrary or capricious manner. This section is very specific, requiring the murder to have been committed in a (1) cold, (2) calculated and (3) premeditated manner. Moreover, it must be done pursuant to a preconceived plan, scheme or design to take human life by unlawful means. A further qualifying factor is that the conduct of the defendant create a reasonable expectation that the death of the human being would result therefrom. Because this provision is so specific, it provides sufficient guidelines for the sentencer.

In *Grayned v. City of Rockford* (1972), 408 U.S. 104, 108-09, 33 L. Ed. 2d 222, 227-28, 92 S. Ct. 2294, 2298-99, the Court described

the important considerations in determining whether legislation proscribing conduct is void for being vague and indefinite to be whether (1) it gives reasonable guidance to the average person, (2) it is designed in such a way as to avoid arbitrary and discriminatory enforcement, and (3) sensitive first amendment rights are involved, thus requiring a higher standard. Clearly, no first amendment rights are involved here. The totality of the words used together, requiring the murder to be done in a "cold, calculated and premeditated manner pursuant to a preconceived plan, scheme or design to take a human life by unlawful means" (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(b)(10)), gives reasonable guidance to the average person and is of a design which would tend to avoid arbitrary enforcement. (*People v. Nobles* (1980), 83 Ill. App. 3d 711, 716, 404 N.E.2d 330, 335.) The words "cold," "calculated" and "premeditated" are ordinary words which must be given their ordinary meanings. This section gives guidance to the average person.

Moreover, this section was not applied by the trial court in an arbitrary or capricious manner. The trial court found the murder to have been committed in a "cold" manner because defendant had had approximately 17 hours to cool off, *i.e.*, the time between the initial confrontation and the actual commission of the crime. The court found this act to be "calculated" and "premeditated" because defendant threatened to kill the victim the night before the shooting and then in fact did kill the victim. The evidence indicated defendant threatened to kill the victim the night before the murder, slept for some eight hours, woke up and still wanted to kill the victim. Defendant asked Scoggins for a gun. The evidence further indicated defendant showed up at Melissa Hare's trailer, freshly washed, and calmly asked for the victim. When defendant found out the victim was not there, he left the trailer and proceeded toward the exit of the trailer park. Defendant saw the victim's car, turned his truck around and pulled up next to the victim's car. Defendant turned off the ignition in his truck, got out of the car, shot the victim two times and then shot the victim again when the victim tried to crawl under his car. Defendant then got into his truck, sped away, hid his truck, and then hid himself in a closet at a friend's house. The evidence clearly established defendant committed the murder pursuant to a preconceived plan and we find this section was not arbitrarily or capriciously applied to defendant.

In *Harich v. Dugger* (11th Cir. 1988), 844 F.2d 1464, 1468-69, the court adopted relevant portions of the opinion in *Harich v. Wainwright* (11th Cir. 1987), 813 F.2d 1082, *vacated* (1987), 828 F.2d 1497,

wherein the court had upheld a Florida provision that allowed the sentencing court to find an aggravating circumstance where the murder "was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification." (*Harich*, 813 F.2d at 1102; Fla. Stat. Ann. §921.141(5)(i), at 501 (West 1985).) The court found that the Florida Supreme Court had held that this section sufficiently "narrow[s] the class of defendants eligible for the death penalty because it requires a 'heightened' level of premeditation." (*Harich*, 813 F.2d at 1102.) The Florida courts have construed this section to require a greater degree of premeditation and cold-bloodedness than is required to obtain a first degree murder conviction. This factor "places a limitation on the use of premeditation as an aggravating circumstance in the absence of some quality setting the crime apart from mere ordinary premeditated murder." (*Brown v. State* (Fla. 1985), 473 So. 2d 1260, 1268, citing *Combs v. State* (Fla. 1981), 403 So. 2d 418, 421; see also *Card v. State* (Fla. 1984), 453 So. 2d 17, 23 (and cases cited therein).) The court concluded that "[g]iven this limiting construction, [this section was] a facially valid aggravating circumstance because it genuinely narrows the class of persons eligible for the death penalty." (*Harich*, 813 F.2d at 1102.) Likewise, section 9—1(b)(10) is facially valid because it generally narrows the class of persons eligible for the death penalty within the meaning of such cases as *Zant v. Stephens* (1983), 462 U.S. 862, 877, 77 L. Ed. 2d 235, 249-50, 103 S. Ct. 2733, 2742 ("an aggravating circumstance must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder"). This provision is more specific than the one upheld in *Harich* and in such Florida cases as *Brown*, and this specificity provides adequate guidelines to the sentencing court when considering it as an aggravating factor. Therefore, we hold section 9—1(b)(10) of the Code is not unconstitutionally vague.

As his final issue, defendant contends his sentence of 50 years' imprisonment was excessive. Defendant points to the mitigating factors of his alcoholism, his extreme emotional distress at the time of the offense, and his troubled youth.

The sentence for first degree murder "shall be not less than 20 years and not more than 60 years, or *** if the court finds that the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty or that any of the aggravating factors listed in subsection (b) of Section 9—1 of the Criminal Code of 1961 are present, the court may sentence the defendant to a term of natu-

ral life imprisonment." (Ill. Rev. Stat. 1989, ch. 38, pars. 1005—8—1(a)(1)(a), (a)(1)(b).) Because the court found an aggravating circumstance existed, defendant was eligible for a term of natural life or a term of 20 to 60 years' imprisonment.

If mitigating factors are presented to the court, absent some contrary evidence, there is a presumption that the trial court considered them. (*People v. Kyse* (1991), 220 Ill. App. 3d 971, 975, 581 N.E.2d 285, 288.) A sentence within the statutory limits will not be disturbed on review absent an abuse of discretion. *People v. Lucas* (1991), 215 Ill. App. 3d 148, 156, 574 N.E.2d 850, 855.

■ There was no abuse of discretion by the trial court in sentencing defendant to 50 years' imprisonment. At the sentencing hearing, the trial court heard testimony from the probation officer in Morgan County, who had assisted in compiling the presentence investigation report on defendant. The trial court also heard testimony from the defendant regarding his alcohol abuse problems and remorse for his actions. When making its final determination of the sentence, the trial court noted the presentence investigation, the possible range of sentences, the evidence offered at trial, and all the testimony presented at the sentencing hearing. The trial court further went through the aggravating and mitigating factors set forth in the Code as well as the mitigating factors of defendant's alcohol abuse, drug abuse, and troubled childhood. It also noted defendant had four previous felony convictions, plus a conviction of driving while under the influence. In total, the trial court's sentencing of defendant spanned 15 pages of the record. Given these facts, the trial court did not abuse its discretion when sentencing defendant to 50 years' imprisonment.

For the foregoing reasons, the defendant's conviction and sentence are affirmed.

Affirmed.

GREEN, P.J., and KNECHT, J., concur.