**FIRST DIVISION**
**June 16, 2008**

No. 1-06-0010

|                                         |   |                    |
|-----------------------------------------|---|--------------------|
|                                         | ) | Circuit Court of   |
| In re Dante W., a Minor                 | ) | Cook County.       |
| (The People of the State of Illinois,   | ) |                    |
| Petitioner-Appellee, v. Dante W.,       | ) | No.  03 JD 4804    |
| Respondent-Appellant).                  | ) |                    |
|                                         | ) | The Honorable      |
|                                         | ) | Rodney Hughes Brooks, |
|                                         | ) |  Judge Presiding.  |


JUSTICE GARCIA delivered the opinion of the court.

After a jury trial, the respondent, Dante W., was adjudicated delinquent based on the commission of first degree murder and aggravated vehicular hijacking.  The respondent now appeals alleging ineffective assistance of counsel and that the trial court erred when it denied his motion to suppress statements.  For the reasons that follow, we affirm.

BACKGROUND

On January 11, 2003, Jimmy Patton was shot and killed in Garfield Park.  His car was also stolen.  After arresting Joshua Council,[1] Chicago police detectives began looking for Robert Hughes, Antonio Woodson, and the respondent.  The respondent was 15 years old when he was arrested on September 22, 2003.  The State filed a petition for adjudication of wardship against the

---

[1] Joshua Council's surname is given various spellings in the record.

No. 1-06-0010

respondent for knowing and intentional murder, murder during the course of a felony, and aggravated vehicular hijacking. The trial court found extended juvenile jurisdiction warranted. The matter proceeded to trial in January 2005.

I. Motion to Suppress Statements

Before trial, the respondent filed a "'Re-Corrected' Motion to Suppress Video Statements," alleging "because of his mental, educational, emotional and/or psychological capacity" the respondent was unable to understand his Miranda rights. The hearing on the respondent's motion to suppress commenced on August 26, 2004, continued from date to date, and concluded on December 21, 2004.

The State presented testimony from Chicago police detectives Greg Swiderek and John Roberts, youth officer Ayanna Parsons, and Assistant State's Attorney (ASA) Caren Armbrust, all of whom who were present with the respondent at various times at the police station. The respondent and his mother, Cherisse W., testified in the respondent's case.[2]

Following the respondent's arrest on September 22, 2003, he was transported to Area 4 and placed in an interview room.

At 4:30 p.m., when Detective Swiderek arrived for his shift, he was told by Officer Harry Matheos that the respondent had been

---

[2]The respondent's mother's first name is given various spellings in the record.

arrested. Because the respondent was a minor, Detective Swiderek told Officer Matheos to notify the respondent's parents. Officer Matheos went to the respondent's address, but no one was home.

At 5:20 p.m., Detective Swiderek and his partner, Detective Roberts, spoke to the respondent for the first time when the respondent knocked on the door of the interview room and asked why he was there. The detectives told the respondent they were investigating the death of a man and the theft of his car on January 11, in Garfield Park. The respondent said he was there, but did not kill the man. Swiderek told the respondent they could not speak with him without a parent or guardian present. The respondent gave detectives his grandmother's phone number.

At 6:30 p.m., Detective Roberts spoke with the respondent's grandfather. Roberts asked him to come to Area 4, because the respondent was under arrest for murder. The respondent's grandfather agreed to come and spoke by phone with the respondent. The grandfather called back to tell Roberts he would not be coming because he was not the respondent's legal guardian. He gave Roberts the phone number of the respondent's mother.

Detective Roberts called the respondent's mother. She told him she was not coming to Area 4 and hung up. Roberts called back and left a message. Roberts then left a message with the respondent's grandparents.

At 7:30 p.m., Detective Swiderek took the respondent to an

interview room used to videotape statements and introduced him to youth officer Parsons. Swiderek told the respondent that Parsons was there to protect his rights and asked the respondent if he understood. The respondent said he did. Swiderek then left the room.

When she was alone with the respondent, Parsons asked him about his "well being." The respondent told her he was fine, he had been given a drink, and he did not have to go to the bathroom. After speaking with the respondent, Parsons attempted to contact his family, but was unsuccessful.

When Detective Swiderek returned, he told the respondent that he was under arrest for the murder of Jimmy Patton and advised the respondent of his <u>Miranda</u> rights. After each right, Swiderek asked the respondent if he understood that right and the respondent answered that he did. The respondent was able to explain to Swiderek what each <u>Miranda</u> right meant. Swiderek also asked the respondent if he understood that he could be charged as an adult. The respondent answered that he did.

Detective Swiderek then had a conversation with the respondent regarding the events of January 11. The respondent "appeared fine" during the conversation. The respondent "spoke intelligently and was able to explain his actions." After speaking with the respondent, Swiderek contacted the State's Attorney's office.

While Detective Swiderek spoke to the respondent, Detective Roberts continued in his attempts to contact the respondent's parents or a guardian. Roberts phoned the Broadview police department and asked that a squad car be sent to the respondent's mother's house. Broadview police officers left a note with Roberts' contact information at her house. Roberts called the respondent's grandfather and left a message. Roberts also left a message on the respondent's grandmother's cell phone.

At 8 p.m., ASA Armbrust arrived at Area 4. Before speaking with the respondent, she met with detectives, reviewed police reports, and watched the videotaped statements of "other offenders who had previously been charged."

At 10 p.m., Armbrust met with the respondent. Detective Swiderek and youth officer Parsons were also present. Armbrust believed Parsons was in the room because the respondent's family "either [was] unwilling [to come to Area 4] or there was no answer at the houses."

Armbrust introduced herself as an assistant State's Attorney. She told the respondent that she was not his attorney. Armbrust then informed the respondent of his Miranda rights. After each right she asked the respondent if he understood that right and he said he did. Armbrust then asked the respondent to explain each right to her. The respondent explained each right in his own words.

5

After the respondent told Armbrust about the events of January 11, Armbrust presented him with choices regarding how to memorialize his statement. The respondent chose to videotape his statement. Armbrust read the "Consent to Videotape Statement" to the respondent and asked if he still wanted to give a statement. The respondent indicated he did and signed the consent form. Armbrust, Swiderek, and Parsons also signed the form.

While Swiderek and Armbrust spoke to the respondent, Roberts continued his efforts to contact the respondent's family. He requested a squad car be sent to the respondent's grandparents' home. He also spoke to the respondent's great-grandmother, Augusta W., and grandmother, Betty Jackson.

At 12:20 a.m., the respondent's mother and grandmother arrived at Area 4. Swiderek, Roberts, and Parsons explained that the respondent was under arrest for murder, that he had chosen to give a videotaped statement, and that it was important a family member sit with the respondent while he made the statement. Neither woman wished to sit with the respondent.

After both women had spoken to the respondent, they still declined to sit with him while he made a statement. Swiderek asked the respondent whom he wanted to sit with him. The respondent chose his grandmother. When Jackson was told the respondent wanted her to sit with him while he made his statement, she agreed and signed the "Consent to Videotape

**6**

Statement" form.

The respondent's videotaped statement was taken at approximately 1:26 a.m. Armbrust, Swiderek, and the respondent's grandmother were present. Before the respondent gave his statement, he was again advised of his Miranda rights. The respondent was asked to repeat in his own words what the "Miranda Warnings" meant to him. Armbrust also asked the respondent if he had been threatened or promised anything in exchange for his statement. He denied he was.

The respondent never said he did not want to give a video statement and never asked for an attorney. His mother and grandmother never stated they did not want the respondent to give a videotaped statement and never asked for an attorney for the respondent.

Before resting, the State sought leave to play the videotaped statement so the court could see the respondent's "demeanor" while he was making the statement. The respondent's counsel objected. The court denied the motion.

The State rested. The respondent moved for a "directed verdict." The trial court denied the motion.

The respondent testified that following his arrest, he was placed in an interview room. Two detectives entered the room, introduced themselves, and asked the respondent about January 11. The respondent told them he was at home. The detectives

questioned the respondent for 30 minutes.  They returned 20 minutes later and asked the same questions.  The respondent again said he was at home.  The second interview lasted for 10 minutes.

The detectives then took the respondent to another room where he watched the videotaped statement of Antonio Woodson, in which Woodson described the events of January 11.  The respondent testified one of the detectives, he did not remember which one, promised him that if he "was to make [a] tape, [he] wasn't going to be charged."  The respondent was told that putting his version of events on tape would be his "best bet" to avoid being charged.

Before making his statement, the respondent was informed of his "rights" for the first time by youth officer Parsons.  The respondent also spoke to his mother and grandmother.

During direct examination, the respondent testified regarding his understanding of his Miranda rights during questioning by ASA Armbrust.

"Q. *** And when she asked you

these rights, did you understand each

and every right as she asked them?

A. Some of them.  Not all of them.

I had--I told her to repeat them, to

explain them to me.

During cross-examination, the respondent testified the detectives also read him Miranda rights and he indicated that he

understood each right.  The respondent testified he understood the <u>Miranda</u> rights when Swiderek read them and when he repeated them back to ASA Armbrust.  However, on redirect, the respondent testified he did not understand his <u>Miranda</u> rights and only said he did to end the interview and get home quicker.

On re-cross-examination, the respondent testified that both detectives promised he would not be charged if he made a statement, but he did not tell anyone about the promise.  On re-redirect, the respondent testified that no one ever asked him about any promises being made in exchange for the statement and that he never signed anything verifying the transcription of the videotaped statement was true and accurate.

After the respondent's testimony, the State renewed its "Motion to Reconsider Exclusion of the Minor's Videotaped Confession."  The State wished to play the portions of the statement during which ASA Armbrust told the respondent that she was a lawyer, but not his lawyer, and when she asked if he had been promised anything in exchange for his statement.  The court denied the motion.

The State called ASA Armbrust in rebuttal.  Armbrust testified she told the respondent she was an assistant State's Attorney and never told him that she was his attorney.  She never told the respondent that he would not be charged if he made a statement.  Armbrust asked the respondent if he had been promised

anything in exchange for his statement and he said no.

Detective Swiderek was also recalled. He denied promising not to charge the respondent if he made a statement.

The respondent testified in surrebuttal. The respondent testified that Detective Roberts came into the interview room and told him that if "I tell him what happened during that day, I wasn't going to be charged." The respondent described Roberts as "about six, six something, six-something feet; white, white guy; he had a suit on." The respondent did not know Roberts' age, but described him as having "light gray, light brown hair."

The respondent's mother, Cherisse W., also testified in surrebuttal. On September 22, Detective Roberts called Cherisse W. between 10:30 p.m. and 11 p.m. to tell her the respondent was in custody because of a stolen car. When she arrived at Area 4, Roberts told her the respondent was under arrest for murder. Roberts told her that "if [the respondent] put his testimony on tape, it [would] be in his best interest to tell his side of the story, and nine times out of ten he would not be charged." Roberts told her the respondent would "not be charged *** because they had the shooter."

Cherisse W. told the detectives it was up to the respondent to decide whether to make a videotaped statement, but she would not have agreed to it. The respondent told her he was making a videotaped statement because Roberts said it would be in his best

interest to do so.

Detective Roberts testified that his only contact with the respondent was when the respondent knocked on the door of the interview room and asked Roberts and Swiderek why he was there. Roberts denied promising not to charge the respondent if he made a videotaped statement. He did not tell the respondent's mother that it would be in the respondent's best interest to make a videotaped statement.

The court denied the motion to suppress. The court found "under the totality of the circumstances," the respondent and his witness were not credible. The court found "the Miranda warnings were properly given[,] that the minor understood the warnings[,] that the minor waived the warnings[,] that the waiver was knowing[,] that the waiver was intelligent[, and] that the waiver was a voluntary waiver."

## II. Trial

In his opening statement before the jury, the respondent's counsel admitted the respondent went to the park "looking for a car to steal." Though the respondent "was physically present when the fatal act occurred," the respondent had no idea that a gun was involved until it was "whipped" out. Counsel asked the jury to find the respondent not guilty because the "true perpetrators" had already been caught and punished.

The State presented the testimony of Steve Banks. On

**11**

January 11, Banks, the victim, and J.C. Parker were drinking in Parker's car when they were approached by three men. One man asked for a light. The victim exited Parker's car and walked to his car. As he attempted to unlock the door, two of the men grabbed the key and the third man pulled out a gun. Banks and Parker drove away to notify the police. When they returned, the victim was face-up on the sidewalk with a visible gunshot wound to the chest.

Detective John Roberts testified that in the course of the investigation into the victim's death, a lead developed which pushed Roberts in the direction of Joshua Council.

On September 5, 2003, Roberts interviewed Council. After the interview, Roberts began to look for Robert Hughes, "Antonio," and the respondent. Hughes was arrested a few days later. While interviewing Hughes, Roberts learned Antonio's last name was Woodson. Woodson was arrested that day. Roberts issued an investigative alert for the respondent after he was unable to find the respondent at his home.

Roberts testified about the arrest of the respondent and his attempts to locate the respondent's mother. His testimony was substantially similar to that given at the suppression hearing. He again denied promising not to charge the respondent if he made a videotaped statement.

Detective Greg Swiderek testified as he did at the

**12**

suppression hearing. The respondent told Swiderek that on January 11, he was at a party at Hughes' house with Council and Woodson. Council wanted to steal a car "to get some rims for his brother's car." Council asked the respondent to come along and to keep an eye out for the police. As they walked to Garfield Park, Council told the respondent that Woodson had a gun.

When they arrived at the park, there was a gold car with the engine running and a red car with people sitting in it. Council walked up to the red car and told the occupants that the gold car belonged to his grandfather. He asked the occupants of the red car where his grandfather was. To clear up Council's questions about the ownership of the gold car, the victim exited the red car. While the victim walked to the gold car, Council asked him for a cigarette. Woodson then walked up to the victim and fired, but nothing happened. Woodson fired again and the victim fell to the ground. Hughes, Woodson, Council, and the respondent got into the gold car and drove away.

Swiderek denied showing the respondent the videotaped statements of Hughes, Woodson, and Council. Swiderek also denied that Roberts promised not to charge the respondent if he made a statement.

Assistant State's Attorney Caren Armbrust's testimony was consistent with her testimony at the suppression hearing. During

her testimony, the respondent's videotaped statement was played.[3] At the beginning of the videotape, Armbrust read the respondent his Miranda rights and gave a "short summary" of the statement. The respondent's videotaped statement was consistent with his statement to Swiderek.

The State rested. The respondent's counsel moved for a "judgment of acquittal." The trial court denied the motion.

The respondent presented the testimony of his mother. Cherisse W. testified the respondent had been diagnosed with "Attention Deficit Disorder" and was in special education classes at school. Cherisse W. testified that when she spoke to Detective Roberts on the phone following the respondent's arrest, he told her the respondent was in custody because of a stolen car. When she arrived at Area 4, she learned the respondent was under arrest for murder. Roberts told her he had advised the respondent to "put his version on the table." Roberts also "stressed at that point that [the respondent] would not be charged because they had the shooter." Cherisse W. was allowed to see the respondent, but was not left alone with him. She thought he looked scared. The respondent told her Roberts had promised not to charge him if he agreed to give a statement on tape. Cherisse W. did not request an attorney for the respondent

_____

[3] The actual videotape is not in the record; only a transcript of the videotaped statement has been provided.

**14**

because he was not going to be charged.

Betty Jackson, the respondent's grandmother, testified that her daughter called her around 11 p.m. and said the respondent was under arrest because of a car. When they arrived at Area 4, Roberts told them the respondent was under arrest for murder. Roberts also said it was in the respondent's best interest to put "his version of what happened on tape" because Woodson, Council, and Hughes had made videotaped statements. Roberts promised the respondent would not be charged if he made a statement.

When Jackson saw the respondent, he was "sitting *** all crunched up, biting on his sweater" and appeared to have been crying. When Jackson asked the respondent if he was sure he wanted to make a statement, he told her he had seen the other statements and wanted to put his version on tape. She did not ask for an attorney for the respondent because he was not going to be charged.

The respondent rested after Jackson's testimony.

The State called Roberts in rebuttal. Roberts denied promising not to charge the respondent if he made a statement.

Before closing statements, the trial court held a jury instruction conference. The State presented instructions from the Illinois Pattern Jury Instructions (IPI). The respondent's counsel presented non-IPI instructions that attempted to define what accountability was not. The State objected to several of

the defense instructions.  The court sustained the objections.

In its closing argument, the State reminded the jury that under accountability, because the respondent participated in a felony that led to a death, he was responsible for that death even if he did not fire the gun.

In his closing argument, the respondent's counsel admitted the respondent intended to steal a car the night of January 11, "there is no way of getting around it.  ***  We are not trying to suggest you overlook that, that was wrong, we offer no excuse for that.  But just as that's an improper motive, it does not make [the respondent] accountable and responsible for murder."

The respondent's counsel admitted the respondent "had knowledge of an offense.  ***  What he didn't have was the level of participation in that offense."  Counsel conveyed to the jury that the respondent should not be held responsible for the victim's death; he should be found not guilty of first degree murder.

During its deliberations, the jury sent out a note asking, "[i]f we find guilty on vehicular hijacking, do we have an option to find [the respondent] not guilty on first degree murder?"  To answer the question, the court reread to the jury IPI, Criminal, 4th, No. 7.02X, "Explanation To Jury That It May Not Find Defendant Guilty of Felony Murder and Not Guilty of Underlying

Felony."[4]  Illinois Pattern Jury Instructions, Criminal, No. 7.02X (4th ed. 2000).

The jury found the respondent guilty of first degree murder and aggravated vehicular hijacking.

The respondent's counsel filed a motion for a new trial. After oral argument, the trial court denied the motion.

The court sentenced the respondent to the custody of the Illinois Department of Corrections, Juvenile Division, until his twenty-first birthday.  The court also sentenced the respondent to a stayed adult sentence of 25 years.  This additional 25-year sentence would be imposed if the respondent violates his juvenile sentence.  This timely appeal followed.

### ANALYSIS

The respondent contends his trial counsel was ineffective because he had a "fundamental misapprehension of the law, and, as a result, repeatedly conceded [the respondent's] guilt to the jury and failed to subject the State's case to meaningful adversarial testing."  The respondent also contends the trial

---

[4] We question how the instruction gave any guidance to the jury in light of the question asked.  The jury's question concerned the inverse situation to that of the jury instruction: whether it could find the respondent <u>guilty of the underlying felony</u> and <u>not guilty of felony murder</u>.  However, no issue is raised regarding the propriety of the instruction.

No. 1-06-0010

court erred when it denied his motion to suppress statements.

## I. Assistance of Counsel

A defendant alleging ineffective assistance of counsel must establish (1) the attorney's performance fell below an objective standard of reasonableness, and (2) this deficient performance prejudiced the defendant. Strickland v. Washington, 466 U.S. 668, 687-88, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984); People v. Albanese, 104 Ill. 2d 504, 526, 473 N.E.2d 1246 (1984). A defendant's failure to satisfy either prong of the Strickland test defeats a claim of ineffective assistance of counsel. Strickland, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.

When reviewing an attorney's performance, this court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Strickland, 466 U.S. at 689, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065, quoting Michel v. Louisiana, 350 U.S. 91, 101, 100 L. Ed. 83, 93, 76 S. Ct. 158, 164 (1955). "Generally, matters of trial strategy will not support a claim of ineffective assistance of counsel unless counsel failed to conduct any meaningful adversarial testing." People v. Patterson, 217 Ill. 2d 407, 441, 841 N.E.2d 889 (2005).

**18**

No. 1-06-0010

To show prejudice "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceeding. Strickland, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.

The Strickland Court also noted that there are some circumstances "where prejudice is presumed." Strickland, 466 U.S. at 692, 80 L. Ed. 2d at 696, 104 S. Ct. at 2067. In United States v. Cronic, 466 U.S. 648, 656-57, 80 L. Ed. 2d 657, 666, 104 S. Ct. 2039, 2045-46 (1984), the Supreme Court explained "[t]he right to the effective assistance of counsel is thus the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing. *** But if the process loses its character as a confrontation between adversaries, the constitutional guarantee is violated." Cronic, 466 U.S. at 656-57, 80 L. Ed. 2d at 666, 104 S. Ct. at 2045-46. Our supreme court adopted this principle in People v. Hattery, 109 Ill. 2d 449, 464-65, 488 N.E.2d 513 (1985).

In Hattery, the defendant was charged with murder and entered a not guilty plea. At trial, the defendant's counsel admitted the defendant's guilt in his opening statement.

**19**

> "'We are not asking you to find
> Charles Hattery not guilty.  At the end
> of your deliberations, you will find him
> guilty of murder.  We are asking you to
> consider the evidence that you hear
> today and in the next few days to
> explain why he did the horrible thing
> that he did.  Once you have found him
> guilty, we will proceed and you will
> find him eligible for the death penalty.
> The question, and the only question
> facing you, will be whether to impose
> the death penalty on Charles Hattery.'"
> (Emphasis omitted.)  _Hattery_, 109 Ill.
> 2d at 458-59.

Defense counsel did not present any evidence and did not make a closing statement; instead, counsel cross-examined the State's witnesses in an attempt to show the defendant was compelled to commit the crime.  While compulsion is not a defense to murder, it can be "a mitigating circumstance sufficient to preclude the imposition of the death penalty."  _Hattery_, 109 Ill. 2d at 459.

The court did not analyze Hattery's ineffective assistance of counsel claim pursuant to _Strickland_.  Instead, the court relied on _Cronic_, 466 U.S. at 659, 80 L. Ed. 2d at 668, 104 S.

**20**

Ct. at 2047, for the proposition that when "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversar[ial] process itself presumptively unreliable."

The court found Hattery's trial counsel did not subject the State's case to meaningful adversarial testing. "The concession of defendant's guilt by his attorneys was unequivocal." Hattery, 109 Ill. 2d at 464. Trial counsel's "strategy--which attempted to show that defendant was guilty of murder but undeserving of the death penalty--was totally at odds with defendant's earlier plea of not guilty." Hattery, 109 Ill. 2d at 464. The comments regarding the defendant's guilt "impressed upon the jury the false notion that the guilt or innocence of the defendant was not at issue, but, rather, had already been decided." Hattery, 109 Ill. 2d at 464. Thus, Hattery's counsel was ineffective because his "actions deprived defendant of the right of having the issue of his guilt or innocence presented to the jury as an adversarial issue." Hattery, 109 Ill. 2d at 464.

In this case, the respondent advocates for the application of the Cronic presumption of prejudice because he contends his counsel conceded his guilt during opening statements.

However, "[t]he rule in Hattery must be narrowly construed." People v. Johnson, 128 Ill. 2d 253, 269, 538 N.E.2d 1118 (1989).

**21**

It is not _per se_ ineffective assistance of counsel when a defendant's attorney "concedes his client's guilt to offenses in which there [was] overwhelming evidence of that guilt." Johnson, 128 Ill. 2d at 269. "In situations where there is overwhelming evidence of guilt and no defense, if counsel contests all charges he is liable to lose credibility with the trier of fact when it comes to charges where a legitimate defense exists." Johnson, 128 Ill. 2d at 270. If defense counsel concedes the defendant's guilt, "ineffectiveness may be established; however, the defendant faces a high burden before he can forsake the two-part Strickland test." Johnson, 128 Ill. 2d at 269-70.

The respondent relies on People v. Chandler, 129 Ill. 2d 233, 245-46, 543 N.E.2d 1290 (1989), to support his contention his ineffective assistance of counsel claim meets that burden.

In Chandler, the defendant was charged with murder, residential burglary, and arson. The defendant admitted to police he was in the victim's home, but denied killing the victim. At trial, the defense did not present any witnesses, even though defense counsel's opening statement told the jury the defendant was going to testify. In his closing argument, defense counsel admitted the defendant entered the victim's house, but he did not stab the victim. "He concluded, 'I don't think if you take a realistic view of this that you can find defendant guilty of murder.'" Chandler, 129 Ill. 2d at 239.

**22**

On appeal, the defendant argued he was "denied his sixth amendment right to effective assistance of counsel when his trial attorney conceded defendant's guilt at trial." Chandler, 129 Ill. 2d at 241. The defendant, relying on Hattery, argued that his trial counsel's actions did not subject the State's case to meaningful adversarial testing.

Our supreme court disagreed, finding "counsel's remarks did not completely and unequivocally concede defendant's guilt." Chandler, 129 Ill. 2d at 245. Unlike the defense counsel in Hattery, Chandler's counsel "vigorously argued that the jury should believe everything [the] defendant told the police, including defendant's denial of killing the victim, and did not concede any fact to which defendant did not admit in his statements to the police." Chandler, 129 Ill. 2d at 245-46. The court "[did] not believe that counsel's statements, standing alone, warrant forsaking the Strickland test under the Hattery analysis." Chandler, 129 Ill. 2d at 246.

Though the court ultimately found Chandler's counsel was ineffective, it did so under Strickland, not Cronic. Thus, Chandler provides no direct support for the respondent's contention that Cronic should be applied here.

Our supreme court further explained its holding in Chandler in People v. Shatner, 174 Ill. 2d 133, 147-48, 673 N.E.2d 258 (1996). In Shatner, the defendant was convicted of first degree

**23**

murder, armed robbery, and arson.  The defendant appealed, alleging his counsel was ineffective for failing to present a defense to the charge of felony murder.  Defense counsel told the jury in his closing statement "'if he's guilty of anything, he's guilty of robbery.'"  Shatner, 174 Ill. 2d at 143.  Shatner contended his counsel's defense strategy was "analogous" to the strategy used in Hattery, because defense counsel admitted to felony murder by conceding the defendant took part in a robbery during which the victim was killed.  Shatner, 174 Ill. 2d at 145.

The court did not agree.  The Shatner court examined the record and found the defendant's counsel was his advocate throughout the proceedings.  Thus, the court declined the defendant's "invitation to discard the two-prong Strickland test in reviewing his ineffective assistance claim."  Shatner, 174 Ill. 2d at 146.  Accordingly, the court examined whether defense counsel's performance fell below an objective standard of reasonableness by comparing Shatner's trial counsel's performance to that of trial counsel in Chandler.

In Shatner, as in Chandler, "defense counsel did not vigorously challenge the prosecution's claim that defendant participated in the robbery of the victim."  Shatner, 174 Ill. 2d at 147.  However, the court found Chandler did "not mandate a finding of ineffective assistance of counsel" because the "court's finding of ineffective assistance did not rest

**24**

exclusively on Chandler's counsel's alleged failure to develop a theory of innocence." Shatner, 174 Ill. 2d at 147. Chandler's counsel was "deficient because he failed to cross-examine several key prosecution witnesses; cross-examined others in an extremely conclusory manner; and called no witnesses to testify." Shatner, 174 Ill. 2d at 147.

On the other hand, Shatner's counsel cross-examined the State's witnesses, presented defense witnesses, and pursued a trial strategy that sought to "minimize his client's admitted involvement in the robbery" by shifting the blame to someone else. Shatner, 174 Ill. 2d at 148. Shatner's "counsel sought to convince the jury that defendant's minimal involvement in the scheme warranted either a finding of innocence or a conviction for robbery only." Shatner, 174 Ill. 2d at 148. Though this strategy was "risky," it was "perhaps the only strategy which could have been seriously pursued given defendant's admissible incriminating statements." Shatner, 174 Ill. 2d at 148.

> "Ultimately, it was the defendant's own
> statements, *** and not the actions or
> strategy of his counsel, which
> undermined any claim of innocence that
> defendant may have had. If a defendant
> enters a not-guilty plea in the face of
> overwhelming evidence of his guilt, we

**25**

are unwilling to find that his counsel was ineffective simply because he failed to contrive a leak-proof theory of innocence on defendant's behalf.  To do so would effectively require defense attorneys to engage in fabrication or subterfuge."  Shatner, 174 Ill. 2d at 148.

Here, as in Chandler and Shatner, the respondent has not met the high burden necessary to forsake the Strickland test.  Though the respondent contends the State's case was not subjected to meaningful adversarial testing because his trial counsel "repeatedly conceded [his] guilt to the jury," the record does not support the assertion that the respondent's trial counsel's performance was equivalent to counsel's performance in Hattery.  The respondent's counsel did not admit anything more than the facts of the respondent's statement to the police.  He never told the jury the respondent was guilty of murder.  In fact, he asked the jury to find the respondent not guilty because the "true perpetrators" of the murder had been arrested.

The respondent's counsel vigorously advocated for the respondent before, during, and after trial.  Pretrial, the respondent's counsel moved to quash the respondent's arrest and to suppress the respondent's statements.  At trial, counsel gave

**26**

opening and closing statements, cross-examined the majority of the State's witnesses, presented defense witnesses, and objected often. Posttrial, counsel filed a motion for a new trial alleging various trial errors.

The respondent's trial did not approach the "adversarial breakdown of the Hattery proceedings, where defense counsel acted not as an advocate for the accused, but as a proponent for the prosecution." Shatner, 174 Ill. 2d at 146. Thus, we decline to review the respondent's ineffective assistance of counsel claim pursuant to Cronic. We will review the claim pursuant to the two-prong Strickland test.

The respondent argues his trial counsel's performance was ineffective, because, as in Chandler, a "misapprehension" of the law led the respondent's counsel to admit the respondent participated in a felony during which the victim was killed. "However, *** the determination in Chandler that counsel was ineffective was not based simply on counsel's apparent failure to comprehend the law of accountability. [Citations.] Rather, *** counsel's misapprehension of accountability had infected the entire conduct of the trial." People v. Williams, 192 Ill. 2d 548, 568, 736 N.E.2d 1001 (2000).

This case is more analogous to Shatner than to Chandler. Here, the respondent's counsel did not dispute the respondent's participation in the plan to steal a car or that an accomplice

**27**

actually killed the victim. Rather, counsel admitted to the contents of the videotaped statement and nothing more. Counsel's strategy was apparently to try to convince the jury that though the respondent went to the park to steal a car, his mere presence when the victim was shot was not enough to hold him accountable for the victim's death. See People v. Perez, 189 Ill. 2d 254, 268, 725 N.E.2d 1258 (2000) ("presence at the commission of the crime, even when joined with flight from the crime or knowledge of its commission, is not sufficient to establish accountability"). In fact, counsel argued the respondent had no idea a gun was involved until it was "whipped" out and submitted jury instructions attempting to define what actions do not make one accountable for the actions of another.

Here, as in Shatner, the proceedings did not lack an adversarial character. The respondent's counsel cross-examined the State's witnesses, presented defense witnesses, moved to suppress the respondent's videotaped statement during pretrial proceedings, and objected often during trial. Though the respondent contends his trial counsel conceded the respondent's guilt "long before the evidence could have seemed overwhelming," the respondent's counsel knew the respondent's videotaped statement was going to be shown to the jury. Instead of advancing a theory of complete innocence that would be rebutted by the video, counsel admitted to the respondent's knowledge of

**28**

the plan to steal a car to contrast the respondent's lack of knowledge when it came to the homicide.

Respondent's counsel also attempted to cast doubt on the legitimacy of the respondent's videotaped statement by examining the detectives and the assistant State's Attorney regarding attempts to contact the respondent's parents or guardians and an alleged promise not to charge the respondent if he made a statement.

As in Shatner, it was the respondent's "own statements *** which undermined any claim of innocence" the respondent's counsel might have advanced. Shatner, 174 Ill. 2d at 148. Had the respondent's counsel argued the respondent was innocent of all charges, he would have lost credibility with the jury when the respondent's videotaped statement was played. Instead, the respondent's counsel admitted to the truth of the statement, argued the respondent should not be held accountable for a murder in which he did not participate, and repeatedly asked the jury to find the respondent not guilty.

Viewing counsel's performance under "the totality of the circumstances" of this case, the respondent's counsel's strategic decision to admit to the facts of the respondent's statement and nothing more was not unreasonable. Shatner, 174 Ill. 2d at 147. Thus, the respondent's claim of ineffective assistance of counsel fails.

No. 1-06-0010

## II. Motion to Suppress

The respondent next contends the trial court erred when it denied his motion to suppress statements when "the record affirmatively shows [the respondent] did not understand his right to counsel and therefore could not validly waive it." The respondent alleges his testimony at the suppression hearing, his "limited mental capacity," and the lack of a concerned adult who helped him to understand his rights show that he did not understand his Miranda rights and, thus, could not have knowingly waived them.

The State contends the respondent waived this argument for the purpose of his appeal by failing to include it in his posttrial motion. See People v. Enoch, 122 Ill. 2d 176, 186, 522 N.E.2d 1124 (1988) (to preserve an issue for appeal, the claimed error must be raised at trial and in a written posttrial motion).

The respondent responds that counsel's failure to include this claim in his posttrial motion was ineffective assistance of counsel. We disagree.

The respondent's posttrial motion argued the trial court erred when it denied the respondent's motion to quash his arrest for lack of probable cause, that the jury "completely disregarded" the testimony of the respondent's mother and grandmother, that the State's sole eyewitness did not identify the respondent, that the police committed misconduct, and that

**30**

the trial court erred when it answered the jury's note. Though the respondent's counsel did not include a claim regarding the respondent's alleged misunderstanding of his <u>Miranda</u> rights, it is possible that was a strategic decision.

The respondent's motion to suppress statements was denied after a lengthy hearing and a specific finding that the respondent was not credible. Under the circumstances, it was not unreasonable for the respondent's counsel not to include the claim in his motion for a new trial.

Even were we to relax the waiver rule, the record does not, as the respondent contends, "affirmatively" show the respondent did not understand his right to counsel.

The respondent does not deny he was given his <u>Miranda</u> rights several times. The respondent also does not deny he told Swiderek and Armbrust that he understood those rights. The respondent told Swiderek the right to an attorney "means [the respondent had] the right to have an attorney" when speaking to the police. When the respondent told Armbrust he did not understand the right to have an attorney during questioning, she explained that right to the respondent several times.

However, to support his contention the State did not prove he made a knowing waiver, the respondent points to his explanation of the right to an attorney, "I don't have to talk unless I want my lawyer here" as proof he did not understand the

**31**

No. 1-06-0010

right to an attorney.

When reviewing a ruling on a motion to suppress, this court "will accord great deference to the trial court's factual findings, and will reverse those findings only if they are against the manifest weight of the evidence; however, the court will review <u>de novo</u> the ultimate question posed by the legal challenge to a trial court's ruling on a motion to suppress." <u>People v. Braggs</u>, 209 Ill. 2d 492, 505, 810 N.E.2d 472 (2003). Factual findings receive this deference because the trial court "assessed credibility [and] demeanor." <u>People v. Bernasco</u>, 138 Ill. 2d 349, 364, 562 N.E.2d 958 (1990).

"The State has the burden of proving, by a preponderance of the evidence, that defendant made a knowing, intelligent and voluntary waiver of his or her rights." <u>People v. Reid</u>, 136 Ill. 2d 27, 51, 554 N.E.2d 174 (1990). "Once the State has established its <u>prima facie</u> case, the burden shifts to the defendant to show that his waiver was not knowing, intelligent or voluntary." <u>Reid</u>, 136 Ill. 2d at 51. "[I]n order to effect an intelligent and knowing wavier of <u>Miranda</u> rights, a defendant must have ' " 'a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.' " ' " <u>Braggs</u>, 209 Ill. 2d at 515, quoting <u>Bernasco</u>, 138 Ill. 2d at 360, quoting <u>Patterson v. Illinois</u>, 487 U.S. 285, 292, 101 L. Ed. 2d 261, 272, 108 S. Ct. 2389, 2395 (1988).

"In determining whether a defendant knowingly and intelligently waived his Miranda rights, a court must consider the totality of the circumstances, including the characteristics of the defendant and the details of the interrogation, without any one circumstance or factor controlling." Reid, 136 Ill. 2d at 54-55; see also Bernasco, 138 Ill. 2d at 368 ("[w]hether a defendant intelligently waived his right to counsel depends, in each case, on the particular facts and circumstances of that case, including the defendant's background, experiences, and conduct").

"[T]he receiving of an incriminating statement by a juvenile is a sensitive concern." People v. Prude, 66 Ill. 2d 470, 476, 363 N.E.2d 371 (1977). "[C]are must be taken to assure that a juvenile's incriminating statement was not the product of ignorance of rights or of adolescent fantasy, fright, or despair." In re W.C., 167 Ill. 2d 307, 328, 657 N.E.2d 908 (1995). A juvenile's "mental capacity *** must be taken into consideration in determining whether a waiver was valid." W.C., 167 Ill. 2d at 328. The existence of a "mental deficiency *** is a factor which must be considered in the totality of the circumstances under which the right to counsel was waived or a statement or confession was given." W.C., 167 Ill. 2d at 328.

Though the respondent told Armbrust he understood the right to an attorney after she explained it to him, the respondent

**33**

later said that he did not understand any of his rights. The respondent claimed he only said that he understood his rights because he was promised he was not going to be charged.

At the completion of the suppression hearing, the trial court found the respondent was not credible. The respondent testified he understood his _Miranda_ rights, he understood some of his _Miranda_ rights and he understood the remaining rights after they were explained to him, and that he never understood his rights, but he said he did because he had been promised that he was not going to be charged if he made a statement. Swiderek and Armbrust testified the respondent told them he understood his rights, could explain his rights, and asked for an explanation of the rights he did not understand.

It is the trial court's "responsibility to judge the credibility of the witnesses, and to consider and weigh each of the factors." _Reid_, 136 Ill. 2d at 59. Here, after hearing the respondent's testimony and observing his demeanor, the trial court did not find the respondent credible, and instead found a knowing and intelligent waiver. Considering the totality of the circumstances, that finding was not against the manifest weight of the evidence.

The respondent next argues he did not understand his _Miranda_ rights because of his "limited mental capacity."

The respondent relies on the "Amended Social Investigation

**34**

Report" as "scientific support" for the respondent's alleged inability to understand his rights. According to this report, the respondent was diagnosed with a "level three learning disability" and read at a third-grade level.

However, nothing in the record suggests the respondent's third-grade reading level prevented him from understanding Swiderek's and Armbrust's oral explanations of his rights. Additionally, the fact the respondent was in special education classes does not lead directly to the conclusion that at age 15 and after at least four other arrests, the respondent did not understand his rights. The report which analyzed the respondent's reading level also stated that the respondent's academic difficulties were because of his truancy and that his current teacher though the respondent was a "bright kid" who understood "abstract things."

The respondent next contends his statements should be suppressed because no "concerned adult" helped him to understand his rights.

However, the record indicates the respondent spoke to several concerned adults. The respondent spoke to his grandfather and youth officer Parsons before making any statements. After the respondent made his initial statements, but before the videotaped statement, he spoke to both his mother and grandmother. The record indicates the respondent's

grandmother was in the room when the respondent was given his
Miranda rights before making the videotaped statement.  The
respondent's grandmother heard the respondent state he understood
each right and the respondent's explanation of each right in his
own words.

The trial court's determination that the respondent
knowingly and intelligently waived his rights was not against the
manifest weight of the evidence.  We therefore conclude the
respondent's suppression motion was properly denied.

CONCLUSION

For the reasons stated above, the decision of the circuit
court of Cook County is affirmed.

Affirmed.

CAHILL, P.J., and R. GORDON, J., concur

# REPORTER OF DECISIONS - ILLINOIS APPELLATE COURT

**In re Dante W., a Minor**
**(The People of the State of Illinois,**
**Petitioner-Appellee, v. Dante W.,**
**Respondent-Appellant).**

## No. 1-06-0010

**Appellate Court of Illinois**
**First District, First Division**

**Filed: June 16, 2008**

**JUSTICE GARCIA delivered the opinion of the court.**

**CAHILL, P.J., and R. GORDON, J., concur.**

**Appeal from the Circuit Court of Cook County**
**Honorable Rodney Hughes Brooks, Judge Presiding**

| | |
|---|---|
| **For RESPONDENT - APPELLANT** | **Michael J. Pelletier, Deputy Defender**<br>**Debra Loevy-Reyes, Assistant Appellate Defender**<br>**Office of the State Appellate Defender**<br>**203 North LaSalle Street-24th Floor**<br>**Chicago, Illinois 60601** |
| **For PETITIONER - APPELLEE** | **Richard A. Devine, State's Attorney**<br>**James E. Fitzgerald, Assistant State's Attorney**<br>**Peter Fischer, Assistant State's Attorney**<br>**Clare Wesolik Connolly, Assistant State's Attorney**<br>**State's Attorney, County of Cook**<br>**Richard J. Daley Center, Room 309**<br>**Chicago, Illinois 60602** |