2020 IL App (1st) 1-17-1151-U

FIRST DIVISION
May 4, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of |
| | ) | Cook County, Criminal Division. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 14 CR 21541 |
| | ) | |
| KEITH MARTIN, | ) | |
| | ) | Honorable |
| | ) | Joseph M. Claps, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

PRESIDING JUSTICE GRIFFIN delivered the judgment of the court.
Justices Hyman and Walker concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant failed to carry his burden of demonstrating that defense counsel was constitutionally ineffective. The trial court did not arbitrarily or automatically consider defendant's claim of innocence as an aggravating factor during sentencing.

¶ 2    After a bench trial, defendant Keith Martin was convicted of shooting his girlfriend and fatally shooting her son. The trial court sentenced him to consecutive prison terms of 15 years for aggravated discharge of a firearm and 55 years for first-degree murder. Defendant appeals, and claims his counsel was constitutionally ineffective. Defendant separately contends that the trial

court arbitrarily increased his sentence after he asserted his innocence during allocution. For the following reasons, we affirm the judgment of the circuit court of Cook County.

¶ 3                                    I. BACKGROUND

¶ 4      On July 18, 2014, defendant was arrested in Wisconsin for the shooting of Anita Pierce-Thompson (Anita) and shooting death of her son, Addarrius Thompson. Defendant waived his *Miranda* rights, agreed to speak with Chicago Police Officers and denied any involvement in the shootings, which took place on July 12, 2014. Defendant told the officers that he was with Mona Ford on the night in question and therefore, could not have committed the crimes. Following his extradition to Illinois, defendant was charged with several criminal offenses, including aggravated battery with a firearm (720 ILCS 5/12-3.05(e)(1) (West 2014)) and first-degree murder (720 ILCS 5/9-1(a)(1) (West 2014); 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2014)). Defendant's case was tried before a judge on February 15, 2017.

¶ 5                                    A. Opening Statements

¶ 6      The State told the trial court that defendant was in a dating relationship with Anita. They shared an apartment and Anita's two adult sons, Addarrius and Angelo, stayed with them. After Angelo allegedly beat up his girlfriend at the apartment, defendant called the police. This event caused a rift in the family. Defendant got into a dispute with Angelo, and another argument erupted between defendant and Addarrius. Defendant wanted them out of the apartment and grew increasingly agitated with the situation. On July 12, 2014, he walked into Anita's apartment and shot and killed Addarrius. On his way out, defendant shot Anita in the chest.

¶ 7      Defense counsel opened by stating that the witnesses would not place defendant at the scene of crime. He alluded that there was "an issue with this young lady, the victim that lived, who

purports to be this gentlemen's girlfriend and how she is the witness to this" and concluded by re-emphasizing that the evidence would fail to place defendant at the scene.

¶ 8                                B. Anita Pierce-Thompson

¶ 9     Anita testified that in July of 2014, she and defendant were living together in a three-bedroom apartment in Chicago. The building was a two-flat and she lived on the second floor. Defendant's name was on the lease, but Anita paid the rent. Her elderly mother and two adult sons, Addarrius and Angelo, lived in the apartment with her. Anita's mother passed away before trial.

¶ 10    On the night of July 10, 2014, a fight broke out at the apartment between Angelo and his girlfriend. She sustained an eye injury during the fight and defendant was "upset" with Angelo, "just plain angry." Defendant called the police. Paramedics took Angelo's girlfriend to the hospital and Angelo left the apartment. Defendant stayed the night.

¶ 11    The next day, July 11, 2014, defendant got into an argument with Angelo at the apartment. Defendant called the police a second time. Angelo and his girlfriend left the apartment around 10:00 p.m. or 11:30 p.m. Anita told defendant it was "bogus" for him to have called the police. Another argument erupted on the front porch, this time between defendant and Addarius. Defendant demanded that Addarrius give him the keys to the apartment and leave. Anita heard defendant say there were "three people that got to go."

¶ 12    Anita tried to escape the situation by watching television in her bedroom, but defendant broke the television antenna in half. He then left the apartment in his gray Ford pickup truck. Defendant's truck was "very loud" because the "muffler had fell out or something." Addarrius walked to the corner store and defendant returned to the apartment while he was out.

¶ 13    Anita testified that defendant was "hostile." Defendant demanded that she tell him where Addarrius was hiding. Anita walked downstairs to the front porch and tried to call her mother, who was still in the apartment. Defendant grabbed Anita's cell phone, broke it in half, and threw it into the neighbor's yard. She retrieved the phone and took a seat next to defendant on the porch.

¶ 14    At that moment, defendant pulled a gun from his waistband, placed it to the middle of Anita's chest and "pulled the trigger three times." Anita heard a "click, click, click," but no bullets discharged from the gun. Defendant told Anita, "[d]on't worry about it. It's just a play gun. It ain't real." Anita got up and walked down the street.

¶ 15    At some point, Anita turned around and started walking back to the apartment building. When she was several houses away, Anita heard a gunshot. She reached her apartment and saw defendant coming down the stairs. He was "angry" and "appeared to be in a rush." They met at the bottom of the stairs and defendant grabbed Anita's left wrist. He shook it and told her not to ever walk away from him again. Defendant then placed his gun to Anita's left breast and pulled the trigger. This time the gun discharged. Anita was shot.

¶ 16    Defendant left in his truck and Anita climbed the stairs to her apartment. She found her son, Addarrius, lying dead on living room floor. Her grandmother was standing over him. Anita called the police at 1:15 a.m. and asked, "[c]an I get a police? I've just been shot by Keith Martin. My son's been shot." Anita called out to her neighbor, Lateena Thigpen, who was sitting outside on her porch. The police arrived and Anita was taken to the hospital.

¶ 17    On cross-examination, Anita testified that she had never seen defendant with a gun. She knew defendant was married to another woman. Anita and defendant "never had any altercations" prior to the shooting, and his actions were uncharacteristic of his ordinary behavior. Anita admitted

that she failed to call the police after defendant placed a gun to her chest the first time. She also admitted that defendant was angry with Angelo, not Addarrius.

¶ 18                                    B. Jaqueline Banks-Lindsay

¶ 19    Jaqueline Banks-Lindsay was defendant's ex-girlfriend. Banks-Lindsay testified that she financed defendant's gray Ford pickup truck. After the shooting, she received three phone calls from defendant. They discussed the truck and defendant told Banks-Lindsay where it was located. Banks-Lindsay relayed the information to the police. When she told defendant that the truck had been recovered by police, defendant responded "s-h-i-t" and hung up.

¶ 20                                    C. Lateena Thigpen

¶ 21    Thigpen lived across the street from Anita's apartment. Sometime after 11:00 p.m. on July 11, 2014, she saw defendant arguing with Addarrius outside. She overheard Addarrius say, "[i]t's my momma's house, I'm not going anywhere." Defendant responded, "[i]'m going to show you." Defendant left the apartment sometime after midnight and returned in his truck.

¶ 22    Thigpen saw defendant enter the apartment building, and then heard a shot and saw a "bright flash" in the window. She saw Anita enter the apartment building and heard another shot. But this time, the shot was closer. Anita asked, "what did you do" and defendant responded, "I told you, I told you." Defendant drove off in his truck at "about 1:00 in the morning" on July 12, 2014. Anita screamed, "my son," and then called out to Thigpen through the apartment window.

¶ 23    On cross-examination, Thigpen testified that she never called the police on the night of July 12, 2014. Thigpen never heard defendant threaten to shoot Addarrius, and lost sight of defendant after he entered the apartment building.

¶ 24                                    D. Angelo Thompson

¶ 25    Angelo Thompson testified that he got into an argument with defendant on July 11, 2014, about his presence at the apartment. Defendant called the police and Angelo left with his girlfriend and her children. Around 1:20 a.m. on July 12, 2014, Angelo received a phone call from his mother and returned to the apartment. Angelo found his brother, Addarrius, lying dead on the floor. On cross-examination, Angelo testified that defendant never threatened him, and he never saw defendant with a gun.

¶ 26                    E. Defendant's Post-Arrest Interview

¶ 27    The State introduced into evidence a video recording of defendant's post-arrest interview. The parties eventually stipulated to certain statements defendant made during the interview. The parties stipulated that: defendant said he was playing dominoes at "81st and Elizabeth" with Steven Lewis, Don Hollinquest, Andre, Tony and others on the night in question; he then went to Mona Ford's house and drank some beer with her brother, Emanuel Ford; he stayed with Mona the entire night; and he lost his cell phone. The post-arrest interview was admitted by the trial court into evidence.

¶ 28                            F. Emanuel Ford

¶ 29    Emanuel Ford testified that in July of 2014, he lived with his sister, Mona, in a three-flat building in Chicago. On July 11, 2014, defendant arrived at the building around 8:30 or 9:00 a.m. Defendant left with Mona in his truck and dropped her off at 3:00 or 3:30 p.m. Defendant said he would return at 6:00 or 7:00 p.m. According to Emanuel, defendant returned to the apartment at 8:00 p.m. When asked whether it was true that defendant had returned to the apartment around 3:00 or 4:00 a.m. the next day, Emanuel answered, "[h]e was there way before then." The State confronted Emanuel with his grand jury testimony.

¶ 30    Emanuel testified before the grand jury in this case on November 12, 2014. He told the grand jury that defendant returned to Mona's house around 10:30 or 11:00 p.m. and that he "saw [defendant] again about maybe 3:00 or 4:00 in the morning." Emanuel also indicated to the grand jury that, in the early morning hours of 1:00 a.m. on July 11, 2014, no one was inside the house besides him and Mona.

¶ 31    Emanuel admitted that he made these statements to the grand jury. However, he proceeded to tell trial court that: (1) the time he gave the grand jury regarding defendant's arrival at Mona's house was "wrong"; (2) defendant was in fact at Mona's house in the early morning hours of July 11, 2014; and (3) he did not "set eyes" on defendant until "8:45 in the morning on the 12th." When asked, he denied having lied to the grand jury.

¶ 32    On cross-examination, Emanuel testified that defendant "stayed the night" at Mona's house on July 11, 2014; he was "in the other room with [Mona], the back room off [Emanuel's] kitchen." Emanuel confirmed that, "between the hours of midnight to about 6:00 in the morning," defendant was at the apartment with his sister and him. Emanuel admitted that he did not check to see if defendant was in the room with his sister. But Emanuel claimed he would have known if defendant left because he does not sleep.

¶ 33                                    G. Mona Ford

¶ 34    Mona Ford testified that she was in a relationship with defendant. Emanuel Ford was her brother and in July of 2014, she lived with him in Chicago. Defendant picked Mona up in his gray truck in the morning on July 11, 2014, and dropped her off around 3:00 p.m. Defendant returned shortly after 11:30 p.m. Mona testified that she heard defendant talking to her brother, and "the next thing [she] knew, [defendant] came into [her] room." Mona confirmed that defendant "was there" and stayed with her through the night.

¶ 35    On November 6, 2014, Mona gave testimony before the grand jury. She testified that defendant dropped her off at her house at 1:00 p.m. on July 11, 2014, and she did not see him again for the rest of the day. When confronted with this testimony, Mona gave the following answer: "[a]nd when I said I didn't see [defendant] that night because if you have two U.S. Marshals, one sheriff *** and one police officer holding you up in the room telling you your're going to jail for aiding, and abetting, that you don't know nothing about, why would you say that someone was around you?" Mona proceeded to deny, or cite as incorrect, several portions of her grand jury testimony.

¶ 36    On cross-examination, Mona testified that, "at the Grand Jury when they asked me did I see [defendant] any more that night and I told them no, I really should have went on and told them yeah." She continued, "[b]ut if you are in a room with two U.S. Marshals, a police officer, and a sheriff, and they telling you you're going to jail for aiding and abetting, you're going to say I didn't see anybody." Defense counsel asked Mona if law enforcement officials told her what to say, she answered, "no."

¶ 37    Defense Counsel then asked Mona if she lied to the grand jury. Mona frantically asked if she needed to get a lawyer. However, she eventually declined to speak with an attorney, stating: "[n]o, I don't want to talk to no lawyer. Then I'll stick to he didn't come back." Defense counsel reminded Mona she was under oath. She testified, "I'm mixed up," and said, "I don't know what time it was, it could have been after midnight, it could be before midnight, I don't know."

¶ 38    The parties stipulated that Mona agreed to testify before the grand jury. They also stipulated that the grand jury prosecutor did not threaten or promise her anything in exchange for her testimony. Certain excerpts of Mona's testimony from the grand jury minutes were included in the stipulation. The parties separately agreed that, if called to testify, the medical examiner would

testify that Addarrius died of a close-range gunshot wound to the chest involving the heart and lungs.

¶ 39        H. Steven Lewis, Andre Hardwick, Donald Hollinquest

¶ 40    The trial court allowed defendant to call defense witnesses Steven Lewis, Andre Hardwick, Donald Hollinquest out of order. They each testified that defendant was with them at Steven's house on July 11, 2014, from around 4:00 p.m. to about 10:30 or 11:00 p.m. Donald testified that defendant left in the evening, but he could not remember the exact time of his departure. All three witnesses denied seeing defendant with a gun.

¶ 41        I. Defense Motion for a Directed Finding

¶ 42    The State rested, and defendant moved for a directed finding. Defense counsel argued that Mona and Emanuel "corroborated" the statements made by defendant in his post-arrest interview. Counsel maintained that it was clear from Mona's testimony that defendant was at her apartment when the shooting occurred. He concluded that it was "impossible," given the inconsistencies in the witness testimony, that defendant shot Anita and killed her son. The trial court denied the motion for a directed finding.

¶ 43        J. Keith Martin

¶ 44    Defendant testified that he and Anita were "best friends" and that his name was on the lease to Anita's apartment. Defendant went to Mona's house at 10:40 or 10:45 p.m. on the night of July 11, 2014. He stayed overnight with Mona in her bed. Defendant denied ever calling Jaquelyn, denied calling the police on July 10, 2014, and denied shooting Addarrius or Anita. Defendant testified that he never possessed a firearm and the first time he learned that Addarrius had been killed was when the police confronted him in Wisconsin. Defendant had traveled to Wisconsin in September to "help a friend take some furniture up there."

¶ 45                                K. Closing Arguments

¶ 46    The State asked the trial court to find defendant guilty. The alibi defense was characterized as "ridiculous," Mona was dubbed a "liar" and the State argued that Emanuel was "impeached." Anita watched as defendant placed a gun to her chest and shot her. She was "unimpeached" and Thigpen "corroborated" her testimony. The State claimed that defendant's phone calls placed to Banks-Linsday, along with his fleeing the jurisdiction to Wisconsin, constituted clear evidence of a guilty conscience.

¶ 47    Defense counsel noted the difficulty of "get[ting] out from under" Anita's testimony, but indicated "there's something more to this." He argued that there were no eyewitnesses to the shooting of Addarius and emphasized defendant's testimony that he did not have a problem with Addarrius. It was Angelo that defendant had issues with, and after their argument, "[defendant] didn't pull a gun out and shoot somebody." Instead, he called the police and made a report.

¶ 48    Regarding Anita's testimony, defense counsel asked, "why would she make this up?" He posed additional questions about the lease of Anita's apartment, defendant being "fed up" with the people staying there and defendant's rent payments. Counsel also mentioned that there was "some drug operation going on" in the house. He concluded by recounting the alibi testimony of the witnesses and told the trial court that the State had failed to meet its burden of proof.

¶ 49                                L. Finding of Guilt

¶ 50    Defendant was found guilty of first-degree murder (720 ILCS 5/9-1(a)(1) (West 2014); 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2014)) and aggravated battery with a firearm (720 ILCS 5/12-3.05(e)(1) (West 2014)). The trial court called defendant's alibi "absurd" and said that describing his defense as a "fairytale" would "give it more credit than it deserves." The trial court "strongly

suggest[ed]" that the State investigate Mona and Emanuel for perjury. Defendant filed a motion for a new trial. The trial court denied it.

¶ 51                                              M. Sentencing

¶ 52    Defendant gave a statement in allocution and told the judge he was innocent. Defendant denied having done any harm to the victims and proclaimed he was "not guilty of this crime." The trial court sentenced him to 55 years for killing Addarrius, and 15 years for shooting Anita in the chest. Defendant's claim of innocence was deemed "insulting" and the trial court told defendant, "if you really want to find the man who committed this offense, Mr. Martin, when you pass the next mirror take a look inside." Defendant's motion to reconsider his sentence was denied.

¶ 53    Defendant appeals, and seeks a new trial on the basis that defense counsel was constitutionally ineffective. Defendant argues that his counsel completely failed to test the State's case and alternatively, claims that he suffered prejudice as a result of his counsel's errors. Defendant separately contends that the trial court arbitrarily increased his sentence after he asserted his innocence during allocution.

¶ 54                                              II. ANALYSIS

¶ 55 Every criminal defendant has a constitutional right to the effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. To prevail on an ineffective assistance of counsel claim, a defendant must prove that counsel's representation was deficient, and the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687-688 (1986). Prejudice is found when there is a reasonable probability, but for counsel's unprofessional errors, that the result of the proceeding would have been different. *Id*. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id*.

¶ 56    In certain contexts, a defendant need not prove prejudice. Pursuant to *United States v. Cronic*, 466 U.S. 648, 659 (1984), prejudice to the defense is presumed "if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing." As opposed to a *Strickland* claim, where a defendant challenges counsel's conduct at specific points during the proceeding, *Cronic* applies when counsel completely fails to oppose the State's case. *Bell v. Cone*, 535 U.S. 685, 697 (2002). *Cronic* is an infrequently applied "narrow exception" to *Strickland*. *Florida v. Nixon*, 543 U.S. 175, 190 (2004). Defendant argues that *Cronic* applies to this case.

¶ 57    Our supreme court has applied *Cronic* only twice in the more than 30 years since the case was decided. See *People v. Cherry*, 2016 IL 118728, ¶ 27. In *People v. Hattery,* 109 Ill. 2d 449, 458 (1985), defense counsel opened at trial by telling the jury his client was guilty of strangling to death a mother and her two daughters. He advanced no theory of defense, presented no evidence and chose not to make a closing argument. *Id*. at 459. The only thing counsel did was attempt to demonstrate on cross-examination that his client was compelled to kill the victims, a defense that was invalid. *Id*. As a result of counsel's total failure, the defendant was granted a new trial. *Id*. at 519.

¶ 58    In *People v. Morris,* 209 Ill. 2d 137 (2004), *overruled on other grounds*, *People v. Pitman*, 211 Ill. 2d 502 (2004), counsel made a plea for jury nullification, but proceeded to present evidence to the jury that her client had brutally beaten an unrelated victim to death and burned his body. Worse yet, the trial court had barred that evidence from being introduced at trial. *Id*. at 185. The court noted that while in certain circumstances the only line of defense may be a nonlegal one (*id*. at 183), defense counsel's introduction of the barred evidence at trial "rendered her trial strategy a nullity." *Id*. at 186. The defendant "stood before the jury throughout the trial with no defensive strategy whatsoever." *Id*. at 188. The court granted the defendant a new trial. *Id*.

¶ 59    *Cronic* does not apply here. Defense counsel presented an alibi theory of defense (which was all he was presented with) and tested the State's proof at several stages during the proceeding. This case is nothing like *Hattery* or *Morris*. This a *Strickland* claim and we will treat it as such.

¶ 60    Defendant claims his counsel was ineffective because he: (1) "misrepresented" the case in his opening statement by indicating that the witnesses would not place defendant at the scene; (2) "effectively conceded" defendant's guilt during closing argument by arguing, with respect to the aggravated discharge offense, that it was not a "whodunnit" if Anita's testimony as believed; and (3) abandoned the role of defense counsel by "weakening" Emanuel's testimony and causing Mona to recant her testimony.

¶ 61    As we indicated above, to prevail under *Strickland* a defendant must show deficient performance and resulting prejudice. *People v. Givens*, 237 Ill. 2d 311, 331 (2010). Prejudice is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *People v. Richardson*, 189 Ill. 2d 401, 411 (2000). Courts are free to dispose of ineffective assistance of counsel claims on the basis of insufficient prejudice. See *Strickland*, 466 U.S. at 697 ("there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one").

¶ 62    We hold that defendant cannot demonstrate prejudice. The testimony of a single eyewitness, if positive and credible, is sufficient for a conviction even in the presence of contradictory alibi testimony. *People v. Homes*, 274 Ill. App. 3d 612, 621 (1995). A trier of fact has no obligation to accept alibi testimony over the positive identification of an accused (*People v. Slim*, 127 Ill. 2d 302, 315 (1989)) and it is well-settled that a conviction may be based solely on circumstantial evidence. *People v. Johnson*, 2018 IL App (1st) 150209, ¶ 19. Based on the totality

of evidence in this record, even if defendant could show that his counsel's performance was deficient, he would still fall short of establishing prejudice.

¶ 63    At trial, Anita testified that defendant put a gun to her body and pulled the trigger three times. Luckily, it failed to discharge. She walked down the block, turned around and heard a gunshot. She reached the apartment building, met defendant at the bottom of the stairs and for the second time, defendant placed a gun to her body and pulled the trigger. This time the gun discharged, and a bullet was sent into her chest. Anita ran upstairs and found her son, Addarrius, lying dead on the living room floor. Anita called the police and named defendant as the perpetrator: "[c]an I get a police? I've just been shot by Keith Martin."

¶ 64    Thigpen provided corroboration for particular events. She saw defendant and Addarrius get into an argument on the night of July 11, 2014. She watched as defendant left the apartment building and returned in his truck. Thigpen saw defendant enter the building and heard a shot and saw a bright flash in the window. She saw Anita enter the building and heard another, closer shot. She heard Anita scream, "My son." She observed defendant leave in his loud truck around 1:00 a.m.

¶ 65    Defendant's primary argument on appeal is that, absent defense counsel's cross-examination of Mona and Emanuel, the trial court would have credited their testimony, discounted Anita and Thigpen's testimony, and acquitted him of the offenses. Defendant's argument is unavailing. Absent counsel's cross-examination of Emanuel and Mona, we are left with two witnesses who took the stand and placed their own credibility at issue.

¶ 66    On direct-examination, Emanuel took back statements he made to the grand jury and equivocated to a degree that would have welcomed the skepticism of any rational trier of fact. Mona changed her story. Even defendant admits in his opening brief that "Mona and Emanuel

14

Ford's grand jury testimony operated as garden-variety impeachment by a prior inconsistent statement." Under these circumstances, there is no reasonable probability that the outcome of defendant's trial would have been any different without his cross-examination of the primary alibi witnesses.

¶ 67 Anita's eyewitness testimony, coupled with Thigpen's corroboration of events, all but foreclosed defendant's opportunity to demonstrate prejudice. Their testimony was positive, unimpeached and found credible by the trial court. *Homes*, 274 Ill. App. 3d at 621; *Johnson*, 2018 IL App (1st) 150209, ¶ 19. When you add defendant's claims that his counsel committed prejudicial error during opening statement and closing argument, the result remains unchanged. Defendant cannot show prejudice and his ineffective assistance of counsel claim must fail.

¶ 68 Defendant next argues that the trial court inappropriately increased his sentence in response to his claim of innocence during allocution. He points out that the State asked for a 60-year sentence, and the trial court added ten years to the State's request. Defendant does not claim that his sentence was outside the applicable statutory sentencing range.

¶ 69 A defendant's sentence should not be altered absent an abuse of discretion. *People v. Ward*, 113 Ill. 2d 516, 531 (1986). An abuse of discretion occurs only where the trial court's decision is "arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it." *People v. Lerma*, 2016 IL 118496, ¶ 23 (quoting *People v. Rivera,* 2013 IL 112467, ¶ 37). Defendant admits that he failed to object during sentencing and did not preserve the issue in a posttrial motion. But regardless of whether defendant forfeited the issue, we find that he has failed to demonstrate any error on the part of the trial court.

¶ 70 A trial court should not automatically and arbitrarily consider a defendant's insistence on his or her innocence as an aggravating factor when fashioning a sentence. *People v. Perkins*, 408

Ill. App. 3d 752, 763 (2011). However, in certain factual circumstances, "a continued protestation of innocence and a lack of remorse may convey a strong message to the trial judge that the defendant is an unmitigated liar and at continued war with society." *Ward*, 113 Ill. 2d at 528.

¶ 71    Defendant has failed to demonstrate that the sentence imposed was any more than a basic consideration of defendant's lack of remorse and the seriousness of his offenses. *People v. Jackson*, 2014 IL App (1st) 123258, ¶ 53 (the seriousness of an offense is considered the most important factor in determining a sentence). Defendant shot his girlfriend at point black range in the chest and killed her son. His alibi defense was rejected, and the trial court urged the State to investigate Mona and Emanuel for perjury.

¶ 72    Defendant maintained that he "was being wrongfully accused" and said that he "really hope[d] somewhere down the line that they really find the person that did this." The trial court responded, "if you really want to find the man who committed this offense, Mr. Martin, when you pass the next mirror take a look inside." The trial court's statement was merely a reaffirmation of its finding of guilt in the case. We find no evidence of an automatic or arbitrary imposition of a greater sentence based on defendant's claims that he was innocent and someone else committed the crimes. The trial court committed no error. A new sentencing hearing is not warranted.

¶ 73                       III. CONCLUSION

¶ 74    Accordingly, the judgment of the circuit court of Cook County is affirmed.

¶ 75    Affirmed.